[Crim. No. 7794. In Bank. Jan. 29, 1965.]

In re ERNEST BARRAGAN LOPEZ and WILLARD ARTHUR WINHOVEN on Habeas Corpus.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Willard Arthur Winhoven, in pro. per., and Morris Lavine and Hugh R. Manes, under appointment by the Supreme Court, for Petitioners.

Stanley Mosk and Thomas C. Lynch, Attorneys General, and Albert W. Harris, Jr., Deputy Attorney General, for Respondent.

TOBRINER, J.—Lopez and Winhoven, at a joint trial, were convicted of first degree murder and four counts of attempted murder in connection with a Los Angeles robbery committed on July 29, 1960, and sentenced to death. We affirmed. (*People* v. *Lopez* (1963) 60 Cal.2d 223 [32 Cal.Rptr.

424, 284 P.2d 16]; cert den, 375 U.S. 994 [84 S.Ct. 634, 11 L.Ed.2d 480].)

Lopez's petition for a writ of habeas corpus presents the question whether we must grant him a new trial because of the admission at trial of his statements allegedly obtained in violation of his Sixth Amendment right to counsel as delineated in the recent cases of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], even though the judgment against him became final before these cases were decided. The petitions for writs of habeas corpus by both Lopez and Winhoven present the question whether the commission of errors in the penalty trials similar to those condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], requires us to grant petitioners new penalty trials. We have concluded that the right to counsel as established in *Escobedo* and *Massiah* does not apply retroactively on collateral attack. We further conclude that we must afford petitioners new penalty trials.

Lopez and Winhoven were arrested in Bakersfield on August 30, 1960, on charges that they committed a burglary in that community. At that time the police also suspected them of perpetrating the Los Angeles robbery of July 29, 1960, in which a fatality had occurred.

The Attorney General concedes that "on September 15th or 16th the Los Angeles police and District Attorney's office arranged to have Robert Luna, who was being held on other criminal charges, placed in the Kern County Jail in the same cell as Lopez and report to the police any statements of Lopez pertinent to the murder then under investigation." The ruse worked; Lopez made several incriminating statements to Luna which also implicated Winhoven. On September 30th Luna wrote down the statements from memory. Upon return to Los Angeles County on September 30, 1960, under a warrant for their arrest issued September 26, 1960, defendants were arraigned on charges of murder. At the trial, Luna testified as to his conversation with Lopez; likewise, Luna's memorandum concerning the content of the conversation was read into the record.

Lopez argued on appeal that his alleged statements to Luna in the Bakersfield jail were admissions obtained by trickery, and that their use constituted a denial of due process. We held the statements admissible since there was "no behavior by the State's law enforcement officers that

overbore defendant's will to resist nor is there any indication that his admissions were anything but 'freely self-determined.' " (*People* v. *Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16.].) We further held that Lopez could not challenge the reading into the record of Luna's notes since he had not objected to this evidence at the trial. (*Id.* at p. 249.)

Lopez now contends that in view of the two above cited decisions of the United States Supreme Court, which were rendered after the final determination of his case, the introduction of the evidence concerning his incriminating statements to Luna wrongfully deprived him of his constitutional right to counsel.

In the first of these cases, *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], a codefendant, in cooperation with federal agents, elicited from the defendant incriminating statements which were communicated by a radio transmitter to the police. The defendant had already been indicted and was represented by counsel. The United States Supreme Court held that "the petitioner was denied the basic protections of [the Sixth Amendment] . . . guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Id.* at p. 206.)

In the second of the cases, *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the Supreme Court extended the right to counsel to the preindictment interrogation stage, holding that "where . . . the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' . . . and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (*Id.* at pp. 490-491.)

We have held today in *People* v. *Dorado* (1965) *ante*, p. 338 [42 Cal.Rptr. 169, 398 P.2d 361] that a defendant's

confession could not properly be introduced into evidence if (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence established that he had waived these rights.

Whether or not Lopez's incriminating statements were improperly admitted either under *Massiah* or under *Escobedo* and *Dorado,* we hold that *Massiah* may not serve as the basis for collateral attack upon judgments which have become final before the date upon which the United States Supreme Court rendered that decision, nor may *Escobedo* or *Dorado* be applied to cases which have become final prior to the date that the United States Supreme Court rendered the *Escobedo* decision.[1]

We reach this conclusion upon the basis of the three following propositions which we shall more fully analyze hereinafter: First, although the United States Supreme Court in *Escobedo,* by providing a suspect with an opportunity to obtain the protection of counsel at the accusatory stage, sought to eliminate conditions which invited coerced confessions, the ruling does not require a retroactive application. Second, new interpretations of constitutional rights have been, and should be, applied retroactively only in those situations in which such new rules protect the innocent defendant against the possibility of conviction of a crime he did not commit; the fact that defendant was denied counsel under *Escobedo* does not affect the issue of guilt. Third, an absolute rule of retroactivity as to interpretations of constitutional rights which envisage the correction of future practices would impair the administration of criminal law and ultimately result in constitutional rigidity.

Turning to the first proposition, we believe that the United States Supreme Court in *Escobedo* sought primarily to prevent

---

[1]Although, strictly speaking, a prospective opinion is one in which the new rule of law applies to future cases only and not even to the case before the court, we are concerned with cases that became final *prior* to *Escobedo* and *Massiah*; thus, we use the terms ''prospective'' and ''retroactive'' accordingly. See *United States* ex rel. *Linkletter* v. *Walker* (1963) 323 F.2d 11, 13.

We shall assume, for the purposes of this analysis, that the decisions which we shall hereinafter designate under the generic term of *Escobedo,* apply to the factual situation presented here.

police tactics which, in the past, have spawned involuntary confessions. The court has concluded that presence of counsel would go far to eradicate such tactics. As a means to that end it held that, if the opportunity to procure such counsel had been denied, the confession or incriminating statement procured by the police should not be introduced into evidence. Thus the rule contemplated the prospective prevention of coercive practices—not the extirpation of such practices committed in the past.

The words of the United States Supreme Court, written by Mr. Justice Goldberg, announce the philosophy of the holding of *Escobedo*: "'We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation. As Dean Wigmore so wisely said: '[*A*]*ny system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby*. The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. . . . The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer,—that is, to a confession of guilt. . . .' (8 Wigmore, Evidence (3d ed. 1940) 309.) (Emphasis in original.) This Court also has recognized that 'history amply shows that confessions have often been extorted to save law enforcement officials the trouble and effort of obtaining valid and independent evidence. . . .' *Haynes* v. *Washington*, 373 U.S. 503, 519 [83 S.Ct. 1336, 10 L.Ed.2d 513].'' (378 U.S. at pp. 488-490.)

Likewise, the dissenting opinion of Mr. Justice White, in which Justices Clark and Stewart joined, recognizes that the objective of the majority was the prevention of practices that might lead to coerced confessions: "This new American judge's rule, which is to be applied in both federal and state courts, is perhaps thought to be a necessary safeguard against the possibility of extorted confessions.'' (378 U.S. at p. 498.)

Indeed four of the justices who joined the majority in *Escobedo* had previously urged that the only effective antidote to abusive police tactics and extorted confessions was the presence of counsel for the accused. In his dissenting opinion

in *Crooker* v. *California* (1958) 357 U.S. 433, 441 [78 S.Ct. 1287, 2 L.Ed.2d 1448], in which Mr. Chief Justice Warren and Justices Black and Brennan joined, Mr. Justice Douglas said, "The third degree flourishes only in secrecy. One who feels the need of a lawyer and asks for one is asking for some protection which the law can give him against a coerced confession." (See also *Cicenia* v. *Lagay* (1958) 357 U.S. 504, 511 [78 S.Ct. 1297, 2 L.Ed.2d 1523] (Douglas, J., dissenting).) Mr. Justice Black, dissenting in *In re Groban* (1957) 352 U.S. 330, 342-343 [77 S.Ct. 510, 1 L.Ed.2d 376], stated, "Nothing would be better calculated to prevent misuse of official power in dealing with a witness or suspect than the scrutiny of his lawyer or friends or even of disinterested bystanders." (See also *Haley* v. *Ohio* (1948) 332 U.S. 596, 605-606 [68 S.Ct. 302, 92 L.Ed. 234] (Frankfurter, J., concurring) ; *Spano* v. *New York* (1959) 360 U.S. 315, 324 [79 S.Ct. 1202, 3 L.Ed.2d 1265] (Douglas, J., concurring.)[2]

The resolution of the court in *Escobedo* to sterilize the police antechamber from the use of coercive tactics undoubtedly resulted from the realization of the inadequacy of present methods of dealing with involuntary confessions. The mere rejection of such confessions from evidence has not prevented police overreaching. Studies have shown that questionable tactics to obtain confessions or admissions continue on a widespread basis.[3] The very difficulty of detecting the coercion that

[2]Justice Traynor recognized that the presence of counsel at the interrogation stage would "discourage police mistreatment of persons in custody." (*People* v. *Garner* (1961) 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680] (concurring opinion).)

[3]In 1931 the Wickersham Commission stated, "the third degree—that is, the use of physical brutality, or other forms of cruelty, to obtain involuntary confessions or admissions—is widespread." U.S. National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement (1931) 4. In *Chambers* v. *Florida* (1940) 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716], in which a conviction was reversed on the basis of a coerced confession, Mr. Justice Black stated "[t]he police practices here examined are to some degree widespread throughout our country." (*Id.* at 240, fn. 15.) Pound, *Legal Interrogations of Persons Accused or Suspected of Crime* (1934) 24 J.Crim.L., C. & P.S. 1014, 1016, 1017; see Warner, *How Can the Third Degree Be Eliminated?* (1940) 1 Bill of Rights Rev. 24, 25.

In 1961 the President's Civil Rights Commission reached similar conclusions about present-day police techniques. Equal Justice Under Law in Justice, 5 U.S. Commission on Civil Rights Reports 5-28 (1961). After a survey of conditions and practices in the State of New Jersey and further research for the United States Commission on Civil Rights, Arnold Trebach concluded that coercive police tactics were still prevalent. "The Court has found that coercion occurred and has overruled convictions only where the evidence strongly indicated that the police used exceedingly shocking methods to obtain confessions. As of late 1961, the Court

might occur during police interrogation[4] and the vagueness of the applicable standards for such determination[5] have been adverse factors necessitating a new approach.

Thus the court in *Escobedo* sought the correction of the *conditions* which invited the coerced confessions and the attendant evils.[6] But the new rule need not reach back to eradicate an environment entombed in the past; if that environment did produce the evil fruit of the coerced confession we may trust that the process of trial, despite the difficulties, disclosed it. We cannot say that the possibility of

had overruled convictions on this basis in a total of only twenty-two cases. In my opinion, these cases represent only the smallest fraction of the total number of convictions that have been based on coerced confessions since the Supreme Court reversed the first such conviction in 1936.'' The Rationing of Justice (1963) 4, 38. See also *Memorandum on the Detention of Arrested Persons and their Production Before a Committing Magistrate* in 2 Chaffee, Documents in Fundamental Human Rights 541 (1951-1952); Comment, *An Historical Argument for the Right to Counsel During Police Interrogation* (1964) 73 Yale L.J. 1000; 3 Wigmore on Evidence, Supp. § 851(a) (1962).

[4]''Law officers usually testify one way, the accused another. . . . The mischief and abuse of the third degree will continue as long as an accused can be denied the right to counsel at this the most critical period of his ordeal.'' (*Crooker* v. *California* (1958) 357 U.S. 433, 443-444 [78 S.Ct. 1287, 2 L.Ed.2d 1448] (Douglas, J., dissenting); *In re Groban* (1957) 352 U.S. 340, 343 n. 16 [77 S.Ct. 510, 1 L.Ed.2d 376] (Black, J., dissenting); Smith, *Public Interest and the Interests of the Accused in the Criminal Process—Reflections of a Scottish Lawyer* (1958) 32 Tulane L.Rev. 349, 354.)

[5]''Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused's will has been overborne—facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from facts are often determinative.'' (*Jackson* v. *Denno* (1964) 378 U.S. 368, 390 [84 S.Ct. 1774, 12 L.Ed.2d 908]; Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure* (1960) 69 Yale L.J. 1149, 1188; Mueller, *The Law Relating to Police Interrogation, Privileges and Limitations* in Sowle, Police Power and Individual Freedom (1962) 131, 137-142; Comment, *An Historical Argument for the Right to Counsel During Police Interrogation* (1963) 73 Yale L.J. 1000, 1007-1010, 1042-1045.)

[6]See Packer, *Two Models of the Criminal Process* (1964) 113 U.Pa. L.Rev. 1, 36. Jurisdictions placing similar controls on police interrogation have done so to prevent coercive police tactics. Patrick Devlin, Justice of the High Court of England, in discussing the Judges' Rules, which place controls on the use of statements elicited during interrogation, stated, ''The extraction of confessions has always been condemned by the common law; but there are methods of questioning which, without the use of threats or violence, tend to be unfair or oppressive; and it is against them that the Judges' Rules are directed.'' (The Criminal Prosecution in England (1958) 33.) The Evidence Act of India (1878) which, in effect, prohibits the interrogation of suspects, was said to be directed at police abuses. (Monir, Principles and Digest of the Law of Evidence (3d ed. 1950) 215.) *Chalmers* v. *H.M. Advocate* (1954) Sess. Cas. 66, 78-79 (Scotland).

abuse in the past is such that the *voluntary* statement then elicited must now be exorcised.

Second, unlike other rulings of the United States Supreme Court dealing with new interpretations of the Constitution, the *Escobedo* rule does not automatically call for retroactive application in order to correct past convictions of innocent defendants. Whatever the inadequacies of our prior procedures, we do not believe that they carried a substantial risk of the conviction of an innocent person because of the use in evidence of his voluntary statement.

Without discussion, the United States Supreme Court has applied retroactively on collateral attack its decisions requiring procedural fairness at criminal proceedings that vindicated an indigent's right to counsel at trial[7] and on appeal,[8] that guaranteed an indigent's right to a transcript of the trial,[9] and that imposed more stringent standards for determining the voluntariness of confessions.[10] Without counsel, a defendant unskilled in trial technique might not be able properly to establish his innocence at the trial. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 68-69 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527] ; *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 344-345 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733].) Without a transcript a defendant could not obtain an adequate appellate review of alleged errors at the trial which might be prejudicial. (*Griffin* v. *Illinois* (1956) 351 U.S. 12, 16 [76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055].) The involuntary confession, always potentially unreliable, could result in the conviction of the guiltless defendant. (*In re Harris* (1961) 56 Cal.2d 879, 886 [16 Cal.Rptr. 889, 366 P.2d 305] (Traynor, J., concur-

---

[7]*Doughty* v. *Maxwell* (1964) 376 U.S. 202 [84 S.Ct. 702, 11 L.Ed.2d 650] (per curiam); *Pickelsimer* v. *Wainwright* (1963) 375 U.S. 2 [84 S.Ct. 80, 11 L.Ed.2d 41] (per curiam); *LaVallee* v. *Durocher* (1964) 377 U.S. 998 [84 S.Ct. 1921, 12 L.Ed.2d 1048]. See Comment, *The Supreme Court, 1963 Term* (1964) 78 Harv.L.Rev. 143, 186; Pope, *Further Developments in the Field of Frivolous Applications. Is Proliferation Probable?* (1963) 33 F.R.D. 423, 424-425; but see Freund, *New Vistas In Constitutional Law* (1964) 112 U.Pa.L.Rev. 631, 637-638.

[8]*Smith* v. *Crouse* (1964) 378 U.S. 584 [84 S.Ct. 1929, 12 L.Ed.2d 1039] (per curiam); *Ruark* v. *Colorado* (1964) 378 U.S. 585 [84 S.Ct. 1935, 12 L.Ed.2d 1042] (per curiam).

[9]*Eskridge* v. *Washington State Board of Prison Terms & Paroles* (1958) 357 U.S. 214 [78 S.Ct. 1061, 2 L.Ed.2d 1269]; but see *Norvell* v. *Illinois* (1963) 373 U.S. 420 [83 S.Ct. 1366, 10 L.Ed.2d 456].

[10]*Reck* v. *Pate* (1961) 367 U.S. 433 [81 S.Ct. 1541, 6 L.Ed.2d 948]; see Note, *Prospective Overruling and Retroactive Application in the Federal Courts* (1962) 71 Yale L.J. 907, 939, fn. 173; Note, *Collateral Attack of Pre-Mapp* v. *Ohio Convictions Based on Illegally Obtained Evidence in State Courts* (1962) 16 Rutgers L.Rev. 587, 592, fn. 32.

ring).)[11] To reject the retroactivity of the above constitutional rights would be to sanction the continued incarceration of a defendant despite errors at the trial which, upon correction, could well establish his innocence.

The *Escobedo* rule did not, however, emanate from the inherent unreliability of the confessions introduced in the trials of the past or from the uncertainty of the guilt of those who had thus confessed; it emerged from the belief that secret interrogation was the source of coercion, that the opportunity for the presence of counsel would end the secrecy and that the exclusion of the confession obtained without such opportunity would deter those tactics. The court sought to discourage oppressive police practices; it did not seek to undo the procedures of yesterday, which despite their undesirability did not necessarily cause the conviction of the innocent.[12]

The same considerations which induce the denial of a retrospective application of the rule against the introduction of illegally seized evidence support a similar result here. The chief purpose of the rule in *Mapp* v. *Ohio* (1961) 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933], was to preclude police conduct which ignored "the right to privacy embodied in the Fourth Amendment" and to make certain that "the right to be secure against rude invasions of privacy by state officers . . . no longer . . . remain[ed] an empty promise." (*Id.* at p. 660.) Although all courts do not agree, many have held that *Mapp* cannot be the basis for collateral attack on final judgments because the purpose of elevating the exclusion of illegally procured evidence to a constitutional requirement lies in deterring unconstitutional police searches.[13] Thus, since the admission of illegally obtained evidence does not infect the trial of the particular individual with unfairness, and

[11]See Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure* (1960) 69 Yale L.J. 1149, 1187, fn. 124.

[12]Although the court in *Escobedo* grounds the decision on the Sixth Amendment right to counsel, it does not indicate that the denial of counsel at the interrogation stage would result in reversal absent the introduction of an incriminating statement. The court also indicates that the presence of counsel at interrogation will make meaningful the accused's right to remain silent. This reason does not relate to the erroneous conviction of the innocent since rarely do guiltless persons voluntarily confess.

[13]"[T]he purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Mapp* v. *Ohio* (1961) 367 U.S. 643, 656 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933].

since deterrence operates prospectively only, the purpose of *Mapp* would not be served by retroactive application.[14]

To use the words of Judge Medina in *United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12, 19, ". . . the new exclusionary principle does not arise out of any claim that the evidence that was admitted is untrustworthy or that the trial was tainted by some fundamental unfairness in regard to the interests of the particular defendant." Or as Chief Justice Traynor has stated, "It is not the purpose of the exclusionary rule to protect the guilty. Its purpose of deterring lawless law enforcement will be amply served in any state from now on by affording defendants an orderly procedure for challenging the admissibility of the evidence at or before trial and on appeal." (*Mapp* v. *Ohio at Large in the Fifty States* (1962) Duke L.J. 319, 341.)[15] Likewise the role of *Escobedo* in deterring improper police conduct will not be served by retroactive application.[16]

---

[14]Cases refusing to apply *Mapp* on collateral attack include *United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12; *United States* ex rel. *Emerick* v. *Denno* (1963) 220 F.Supp. 890; aff'd. 328 F.2d 309; *Gaitan* v. *United States* (1963) 317 F.2d 494; *United States* ex rel. *McCrea* v. *LaVallee* (1963) 219 F.Supp. 917; *Moore* v. *State* (Ala. 1962) 146 So.2d 734; *People of the State of New York* ex rel. *Ellington* v. *Fay* (1962) 207 F.Supp. 595; *Commonwealth* ex rel. *Stoner* v. *Myers* (1962) 199 Pa.Super. 341 [185 A.2d 806]; *Commonwealth* ex rel. *Wilson* v. *Rundle* (1963) 412 Pa. 109 [194 A.2d 143]; *People* v. *Muller* (1962) 11 N.Y.2d 154, 227 N.Y.S.2d 421 [182 N.E.2d 99]; *Sisk* v. *Lane* (1964) 331 F.2d 235; *Villasino* v. *Maxwell* (1963) 174 Ohio St. 483 [190 N.E.2d 265]; *State* v. *McNulty* (1964) 84 N.J.Super. 30 [200 A.2d 799]; *United States* ex rel. *Linkletter* v. *Walker* (1963) 323 F.2d 11; cert. granted (1964) 377 U.S. 930 [84 S.Ct. 1340, 12 L.Ed.2d 295] (No. 1125, 1963 term, renumbered No. 95, 1964 term); see *In re Harris* (1961) 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305] (Traynor, J., concurring); cases applying *Mapp* retroactively include *United States* ex rel. *Holloway* v. *Reincke* (1964) 229 F.Supp. 132; *Hall* v. *Warden, Maryland Penitentiary* (1963) 313 F.2d 483; *United States* ex rel. *Eastman* v. *Fay* (1963) 225 F.Supp. 677; *California* v. *Hurst* (1963) 325 F.2d 891; pet. for cert. filed, 32 U.S.L. Week 3323 (U.S. March 12, 1964) (No. 913, 1963 term; renumbered No. 45, 1964 term).

[15]See *In re Jackson* (1964) 61 Cal.2d 500, 507, fn. 6 [39 Cal.Rptr. 220, 393 P.2d 420]; Comment, *Prospective Overruling and Retroactive Application in the Federal Courts* (1962) 71 Yale L.J. 907; Note, *Collateral Attack of Pre-Mapp* v. *Ohio Convictions Based on Illegally Obtained Evidence in State Courts* (1962) 16 Rutgers L.Rev. 587; Bender, *The Retroactive Effect of an Overruling Constitutional Decision: Mapp* v. *Ohio* (1962) 110 U.Pa.L.Rev. 650; Freund, *New Vistas in Constitutional Law* (1964) 112 U.Pa.L.Rev. 631, 637-638.

[16]The application of *Escobedo* prospectively and retroactively to cases on appeal will be sufficient to deter unlawful police conduct. See *In re Harris* (1961) 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305] (Traynor, J., concurring).

■ Third, a newly defined constitutional right which involves the correction of future practices rather than erroneous convictions of the past should not be subject to rigid retroactivity. We no longer subscribe to that "splendid myth" of Blackstone that all constitutional interpretations are eternal verities that stretch backwards and forwards to infinity.[17] (*United States* ex rel. *Durocher* v. *LaVallee* (1964) 330 F.2d 303, 312; *United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12, 15.) We know now that we must choose here between competing values; we must seek to preserve a dynamic concept of constitutional right rather than sacrifice it upon an unrealistic and destructive altar of absolutism. ■ As Justice Cardozo, in upholding the constitutionality of prospective overrulings by state courts, said, "A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions." (*Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.* (1932) 287 U.S. 358, 364 [53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254].)[18]

Indeed some recent judicial opinions have maintained that it is "generally undesirable to give retroactive effect to overruling decisions, except in the most compelling circumstances." (*United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12, 21; *Lyons* v. *Westinghouse Electric Corp.* (1964) 235 F.Supp.

[17]The court in *State* v. *Smith* (1962) 37 N.J. 481 [181 A.2d 761, 762], said, "Concepts of justice change. Doctrines, incomprehensible today, were once embraced by judges who in their times were doubtless the epitome of the reasonable man. Surely this is so in long-range retrospect. It is equally true that at the moment of change the choice is not necessarily between dead right and dead wrong. The judicial scene is studded with issues upon which conflicting views command respectable support. When a court alters its course, it is often but a preference, a belief that justice is better served in another way, with no intimation that whoever disagrees must be mean or inane."

[18]See also *Chicot County Drainage Dist.* v. *Baxter State Bank* (1940) 308 U.S. 371, 374 [60 S.Ct. 317, 84 L.Ed. 329]; *Aero Spark Plug Co.* v. *B. G. Corporation* (1942) 130 F.2d 290, 298 (Frank, J., concurring); Address of Chief Judge Cardozo (1932) 55 N.Y. St. Bar Assn. Rep. 263, 294 et seq., reprinted in Hall, Selected Writings of Benjamin Nathan Cardozo (1947) 7, 33; Comment, *Prospective Overruling and Retroactive Application in the Federal Courts* (1962) 71 Yale L.J. 907; Levy, *Realistic Jurisprudence and Prospective Overruling* (1960) 109 U.Pa. L.Rev. 1; Note, *Limitation of Judicial Decisions to Prospective Operation* (1961) 46 Iowa L.Rev. 600; Note, *The Effect of Overruling Prior Judgments on Constitutional Issues* (1957) 43 Va. L.Rev. 1279; Note; *Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions* (1947) 60 Harv. L.Rev. 437.

526.) This court has explicitly recognized that in certain situations a decision should not be given retroactive effect. (*Forster Shipbuilding Co.* v. *County of Los Angeles* (1960) 54 Cal.2d 450 [6 Cal.Rptr. 24, 353 P.2d 736]; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672 [312 P.2d 680].)

Courts, in some instances, have refused to apply retroactively a new legal ruling to criminal defendants who were convicted under a prior decision or statute subsequently disapproved. In *Warring* v. *Colpoys* (1941) 122 F.2d 642, 646-647 (Vinson, J., cert. den. (1941) 314 U.S. 678 [62 S.Ct. 184, 86 L.Ed. 543]) a prisoner sought release upon a writ of habeas corpus on the ground that the decision interpreting a federal contempt statute under which he had been convicted had been overruled. In refusing to grant the writ the court stated that the considerations that ''should guide the lawmakers and the lawappliers in making their determinations in respect of whether a change in the law is to be effective only for the future or also for the past . . . should be applicable to both sides of a potential litigation, civil or criminal. . . .'' Courts have refused to apply the *Jencks* rule (*Jencks* v. *United States* (1957) 353 U.S. 657 [77 S.Ct. 1007, 1 L.Ed.2d 1103]) retroactively on collateral attack. (*United States* v. *Gandia* (1958) 255 F.2d 454.) In *Durham* v. *United States* (1954) 214 F.2d 862, in which the Court of Appeals for the District of Columbia announced a new rule for the determination of insanity in criminal cases, the court said, '' [I]n adopting a new test, we invoke our inherent power to make the change prospectively.'' (*Id.* at p. 874.) In *Shioutakon* v. *District of Columbia* (1956) 236 F.2d 666, the court, in holding that under a statute a judge in a juvenile court must inform the juveniles of their right to counsel, applied its decision prospectively.[19]

Petitioner argues that because we deal with a constitutional protection we must apply it retroactively on collateral attack. In refusing to apply *Mapp* retroactively, the Court of Appeals for the Second Circuit met that argument as follows: ''It is pointed out that where constitutional rights are violated prejudice is presumed. It is our view, however, that the development of constitutional law calls into play precisely the same operations of the judicial process as does the development of a body of decisional law in any other field. The extent to which the new doctrine is to be applied should depend, in the language of Mr. Justice Cardozo, upon 'considerations

[19] See *People* v. *Maughs* (1906) 149 Cal. 253 [86 P. 187]; *People* v. *Ryan* (1907) 152 Cal. 364 [92 P. 853].

of convenience, of utility, and of the deepest sentiments of justice.' '' (*United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12, 16.)[20]

█ Nor can we overlook the further consideration that retroactivity would impose impossible burdens upon the administration of criminal justice. Unlimited retroactive application of *Escobedo* would result in the reconsideration of countless cases that were correctly decided under the law in force at the time of trial; in many such cases witnesses and evidence would no longer be available. Many hardened and dangerous criminals would glean the greatest profit from unlimited retroactivity; they serve lengthy sentences imposed long ago; their cases thus offer the least likelihood of successful retrial. To require a general release of prisoners of undoubted guilt would be to cripple the orderly administration of the criminal laws. (See *United States* v. *Sobell* (1963) 314 F.2d 314, 323, fn. 6, 324 (Friendly, J.); *United States* ex rel. *Durocher* v. *LaVallee* (1964) 330 F.2d 303, 314, 315 (concurring and dissenting opinions); *United States* ex rel. *Angelet* v. *Fay* (1964) 333 F.2d 12, 20-21.)[21]

---

[20]The court further stated, ''There is no rule of thumb, nor should there be. It is the burden of this opinion to attempt to demonstrate that, by Mr. Justice Cardozo's test, the *Mapp* v. *Ohio* doctrine should not be given general retroactive effect.

''As we view the problem, there is now at stake one of the most important principles of constitutional interpretation. It has been the proud boast of the most distinguished of our American jurists that the federal Constitution, and especially the Bill of Rights, including the Fourteenth Amendment, is not a rigid aggregation of fundamental rules but a dynamic and flexible document, to be interpreted from time to time to conform to the social and economic needs of a changing society in a modern world. . . . We do not doubt the power of the judicial establishment to decide that the doctrine of *Mapp* v. *Ohio* is to be given general retroactive effect, or to decide that it is not to be given general retroactive effect. There is no philosophical obstacle to a decision either way. But there must be a rational basis for that decision.'' (*Ibid.*) See also *Griffin* v. *Illinois* (1956) 351 U.S. 12, 26 [76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055] (Frankfurter, J., concurring); cases cited in fn. 14 *supra*.

In *Chicot County Drainage Dist.* v. *Baxter State Bank* (1940) 308 U.S. 371, 374 [60 S.Ct. 317, 84 L.Ed. 329], the United States Supreme Court in holding that a decree based on a statute subsequently held unconstitutional was res judicata said, ''It is quite clear, however, that such broad staatements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot be ignored. The past cannot always be erased by a new judicial declaration.''

[21]''It has often been said that the living should not be governed by the dead, for that would be to close our eyes to the changing conditions which time imposes. It seems even sounder to say that the living should not be governed by their posterity, for that, in turn, would be downright chaotic.'' *Warring* v. *Colpoys* (1941) 122 F.2d 642, 647. (Vinson, J.)

A ruling that *Escobedo* compelled retroactive collateral attack could well impede further developments in constitutional law. The absolute application of new interpretations, which on the surface appears as an instrument of fair play, in reality may stand as a formidable barrier to a dynamic application of constitutional standards. If every change must ipso facto be applied to all prior proceedings, no matter how ancient, future change may be put in jeopardy. (See *United States ex rel. Angelet* v. *Fay* (1964) 333 F.2d 12, 20-21; Freund, *New Vistas in Constitutional Law* (1964) 112 U.Pa. L.Rev. 631, 637-638.)

We therefore conclude that because the justification of the requirement of the right to counsel at the accusatory stage lies in the prospective purpose of benefiting the overall system of criminal administration by drying up the sources of coercion, no purpose would be served by applying *Escobedo* retroactively.

Error, however, substantially similar to that committed in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], occurred in the penalty trials. In that case we held that in the penalty phase of a first degree murder case the possibility "that the instructions as to the judge's and Governor's possible reduction of the death penalty tend to mislead the jury into assuming that the rendition of the penalty initiates a chain of proceedings by the court and the Governor which will achieve a reweighing of the sentence and possibly produce its nullification. The instructions and evidence of the Adult Authority's possible grant of parole invite speculative argument to the jury and surmise by it of the possible improper release of a defendant to society in the future; yet that matter does not truly lie in its province but in the expert judgment of the Adult Authority."[22] (At p. 653.)

---

[22]The instruction given in the case appears to be substantially the same as that given in *Morse* except that a sentence was added stating: "You are instructed that while eligibility for release on parole at certain minimum prison terms has been indicated, service by a life prisoner of such minimum prison terms does not mean that he necessarily would be so released on parole upon service of such minimum term."

It further appears that, instead of presenting statistical evidence by stipulation as was done in *Morse*, defendant Lopez called Joseph Spangler of the Adult Authority as a witness, who testified with respect to the number of persons paroled. The prosecution argued to the jury that if it imposed a life sentence, defendants would be eligible to apply for a parole, but if it imposed the death penalty, it would know that it had "done something good for society" by precluding the chance that defendants would take another life in the event of parole or escape.

We held in *In re Jackson* (1964) 61 Cal.2d 500, 506-509 [39 Cal.Rptr. 220, 393 P.2d 420] that such error could be reached by collateral attack and given retroactive application since the rule had been changed subsequent to the judgment becoming final.[23] Under *People* v. *Hines* (1964) 61 Cal.2d 164, 166, 170 [37 Cal.Rptr. 622, 390 P.2d 398], we must reverse the convictions since "substantial deviation from the standards established in *Morse* has occurred."

The writ is granted as to the penalty trials of petitioners. The remittitur issued in Crim. 7067, *People* v. *Lopez* (1963) 60 Cal.2d 223 [32 Cal.Rptr. 424, 384 P.2d 16], is recalled and the judgments imposing death penalties are reversed insofar as they relate to the penalties. In all other respects the judgments are affirmed. Petitioners Lopez and Winhoven are remanded to the custody of the Superior Court of Los Angeles County for new penalty trials.

Traynor, C. J., Peters, J., and Peek, J., concurred.

SCHAUER, J.* and McCOMB, J.—We concur in the order affirming the judgments of guilt. We dissent from the order recalling the remittitur in Crim. 7067 and from the order reversing the judgments imposing the death penalty insofar as they relate to the penalties.

Adopting the language of *People* v. *Morse,* 60 Cal.2d 631, 653 [6a] [36 Cal.Rptr. 201, 388 P.2d 33], "we are [not] of

---

[23]The retroactive application of *Morse* on collateral attack differs significantly from such an application of *Escobedo.* The erroneous instructions, evidence and argument condemned in *Morse* obviously affect the fairness of the penalty trial; such errors must have affected such trials before *Morse.* In the instant case we have held that the error proscribed by *Escobedo* did not affect the fairness of the trial; indeed, we have compared the instant case to that of *Mapp* v. *Ohio, supra,* as to which in *Jackson* we said, "The special circumstances of the present case completely differ from those in cases involving the retrospective application of the rule of *Mapp* v. *Ohio.* . . ." 61 Cal.2d at p. 507, fn. 6. Furthermore, as we said in *Jackson,* "the retrospective effect of our holding [in *Morse*] has limited application. Our ruling can only affect those defendants who, awaiting execution after the imposition of the death sentence, suffered the prejudicial error described in *Morse* and *Hines* during their own penalty trials. These are a fixed group, and none hereafter will be added to their number." 61 Cal.2d 507. As we pointed out *supra,* the retroactive application of *Escobedo* would affect countless cases and would cripple the orderly administration of criminal justice.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

the opinion that it is reasonably probable that a result more favorable to [the] defendant[s] as to penalty would have been reached in the absence of the error.'' (See also *People v. Hines*, 61 Cal.2d 164, 174 et seq. [37 Cal.Rptr. 622, 390 P.2d 398].)

Petitioners' application for a rehearing was denied February 24, 1965. Mosk, J., did not participate therein.