[Crim. No. 4057.    Third Dist.    May 24, 1967.]

In re OTHA T. TEDWELL on Habeas Corpus.

Robert F. O'Neal, under appointment by the Court of Appeal, for Petitioner.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws, Ronald W. Tochterman and Nelson P. Kempsky, Deputy Attorneys General, for Respondent.

REGAN, J.—After trial by the court, a jury having been waived, petitioner was found guilty of two counts of violation of section 11501 of the Health and Safety Code (sale of a narcotic other than marijuana). Judgment of conviction was pronounced on November 26, 1963. In his appeal, petitioner, who was represented by counsel, raised the following contentions: insufficiency of the evidence, entrapment, and the denial of the right of confrontation. The judgment was affirmed on November 2, 1964.

Petitioner has filed this petition for writ of habeas corpus contending the admission into evidence of a tape recording between petitioner and police officers was prejudicial error. Respondent argues that the objection to its admission could have been raised on appeal and that therefore habeas corpus does not lie, that there was no ''process of interrogations'' that lent itself to eliciting incriminating statements, and that any error, if error there be, was harmless.

Petitioner's trial was prior to June 13, 1966, the date on which *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], was decided. Thus, that decision is not applicable here. However, the decisions in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], do apply as petitioner's case, although tried prior thereto, had not become final on June 22, 1964. (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

After examining the entire record we conclude the judgment of conviction rests upon a confession violative of *Escobedo* and *Dorado* and therefore cannot stand.

The proscriptions of *Dorado* are evident here. The investigation was no longer a general inquiry into an unsolved crime but had begun to focus on petitioner; the petitioner was in custody; the police authorities were carrying out a process of interrogation that lent itself to eliciting incriminating statements and that did elicit such statements; the police authorities had not effectively informed petitioner of his right to

counsel or of his absolute right to remain silent, and there is no evidence here that petitioner waived these rights. (*People v. Dorado, supra,* 62 Cal.2d at pp. 353-354.)

The evidence produced at the trial was sufficient to support the conviction of petitioner for the sale of a narcotic as charged. Under the provisions of section 31, Penal Code, petitioner was a principal in the crime committed.

At the trial, counsel for petitioner and the state stipulated that the tape-recorded conversation of petitioner and the police officers would be admitted into evidence, and the tape was heard in court. The setting for the recorded interview was the Los Angeles Police Department, with petitioner and three police officers present, and after his arrest. It proceeded by the question and answer technique and elicited statements amounting to a confession.

The questioning of petitioner, who was not given a full and effective warning of his rights at the outset of the interrogation process, was in a police-dominated atmosphere, lacking any semblance of brutalizing practices, but rather a classic example of the soft-sell, in-custody interrogation—psychologically rather than physically oriented. (See *Miranda* v. *Arizona, supra,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The recording[1] furnished ample corroboration of the prosecution's police witness.

We examine now respondent's contention that petitioner has waived the right to present the *Escobedo-Dorado* contention on habeas corpus because he failed to present the ques-

---

[1]The recording:

"Q. Well, Ted, you probably know what this is all about. I am Heckl. This is Cain. We work narcotics. You probably know what this is all about.

"A. I think I do now. I think I understand.

"Q. A guy plays around a little out there and sooner or later does business with a man—something happens to him, you know.

"A. *Yeah, well I'll tell you officer—in this particular case, being truthful, I never had any narcotics to sell anyone. But I had known people that do sell it, so when this gentleman approached me I thought he was a user too. Naturally, I be short with my money. I was riding with another fellow named Jim. I couldn't get out of the car, you know to go with nobody, but I knew people, and I would tell him where to go to get it from these people. In turn I would get a little something for myself. That is the way it happened.*

"  .  .  .  .  .  .  .  .  .  .  .  .

"How many capers did you cut with this guy here? Sit down here.

"A. This gentleman here?

"Q. Yeah.

"A. I don't know. It couldn't have been a great number.

"Q. Couple, three?

"A. Two or three, maybe something like that. I didn't have anything

tion on direct appeal and citing therefor *In re Varnum,* 63 Cal.2d 629, 631 [47 Cal.Rptr. 769, 408 P.2d 97] ; *In re Spencer,* 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33] ; *In re Shipp,* 62 Cal.2d 547, 551-553 [43 Cal.Rptr. 3, 399 P.2d 571] ; and *In re Dixon,* 41 Cal.2d 756, 759-761 [264 P.2d 513].

---

in my possession. It was just that I knew somebody that did. So naturally the person approached me, and he was asked whether I knew anybody where he could get a taste. I knew if I used anything I had trouble.

"Q. You use junk?

"A. Yeah, I use a little anytime I have trouble. I do. I am truthful about that.

"Q. That is the only way to be, Otha.

". . . . . . . . .

Q. You know, Ted, something funny is going on around here. You take an unfortunate person shifting around and uses a little stuff once in a while. These dudes that don't use are out there giving you half a taste and charging you $10-$15 for it. They're eating steaks and driving Cadillacs while some poor boy is hung up. I'd just like to, you know, this is something, you know, I am curious about—don't understand it. Why do you guys protect these dudes?

"A. Well, I tell you the truth. I am not protecting no one, officer.

". . . . . . . . .

"Q. Now you take a fellow like this. Now here is an officer. This is Officer Benton. Now he is a clean dude. He just hits town. How come somebody would attack this poor guy—get him started, get him hooked, put a spike in his arm?

"A. I understand. See—but now in this particular case when he approached me I had no idea of knowing that he didn't use narcotics.

"Q. That is right. You thought he was an old pro.

"A. That is right.

"Q. Because he acted like an old pro.

"A. I would never induce him—say come on, do this or that. When he approached me I had the understanding that he, you know, used narcotics.

"Q. You see I am selfish. I'm looking at this from a policeman's standpoint, see? You take a guy, you know. He spends a few bills a month with some guy buying these little short bags—$6 or $8 for a gram. Can't even get straight. Can even wake up in the morning.

"A. You're right. You're true.

"Q. Now then, you spend a lot of money over a period of time with this dude. He don't use. He is eating steaks and driving Cadillacs.

"A. Right. That is right.

"Q. But you show up short some morning with $3 and try to score.

"A. That is right.

". . . . . . . . .

"Q. Oh, he'll buy you a hamburger, soda pop, give you a buck for your gas, you know, man.

"A. Couple of dollars to make up what I was short or something. Yeah, well so far as —

". . . . . . . . .

"Q. Cold, huh?

"A. Yeah. It's happened. It's happened to me. I couldn't get out of the car to do anything. That's right. But just sit there and wait for somebody to do something for me.

"Q. They hang you, and hang you up, and hang you up.

"A. That's the truth.

"Q. I'll bet you could write a book. I bet it would be interesting, too. You ought to write one.

"A. I'll probably have enough time to do it. [Laughter.]

■ The general rule is, of course, that habeas corpus cannot serve as a substitute for appeal in the absence of special circumstances. (*In re Shipp, supra,* 62 Cal.2d at p. 552.) Nevertheless, this court may afford collateral relief on constitutional grounds if the petitioner had no opportunity to raise the constitutional issue at trial and on appeal. (*In re Spencer, supra,* 63 Cal.2d at p. 406.)

■ Petitioner's trial was held on October 30, 1963, prior to *Escobedo,* which was decided on June 22, 1964. The first *Dorado* decision was filed on August 31, 1964, but a rehearing was granted on September 24, 1964. Petitioner's conviction was affirmed on appeal on November 2, 1964. The second *Dorado* decision was filed on January 29, 1965.

It is apparent from the foregoing chronology that petitioner had no opportunity to raise the constitutional issue at his trial. It is true that after the decision in *Escobedo* the issue could have been raised on appeal by supplemental letter, reply brief, oral argument, or petition for rehearing. As can be seen from the foregoing history, however, the California law on this matter was uncertain and indefinite until after petitioner's appeal had become final. Thus, there are special circumstances present here. In our view the impact of the *Esco-*

---

"Q. Yeah, Ted. It's rough, but that's the way the game is—sometimes you win, sometimes you lose.

"A. But just like I say, you know, I can't deny that I have did this, you know, but I say I never had had a bag of boca of my own to sell, you know. I always knew people that did have it to sell.

"  .    .    .    .    .    .    .    .    .

"Q. You know, we have a heck of a program in California. It's probably the best program in the country. Maybe we can give you some help. I don't know, but maybe we can try.

"A. Whatever. I don't know.

"Q. You are just half a man right now. You can make a living.

"A. Yes, I worked for a fellow until he went out of business.

"Q. All right. Right now you are half a man. When you are using junk, you are half a man. So if you can straighten yourself out, you can make it.

"A. I know it. I understand that.

"  .    .    .    .    .    .    .    .    .

"Q. Ted, you are a desperate person on top of all these problems and before that you worked as a clerk. You were a clerk and a damned good clerk, I understand.

"A. Yes, I was. I worked steady.

"Q. Probably you were more dependable than guys who could come to work every day.

"A. I didn't miss many days.

"Q. Then you got yourself a habit and couldn't work any more? Here, I'll get you a cigarette, man.

"A. Okay.

"Q. Ted, do you want a cigarette? Can you make it all right? Take your time, no hurry." (Italics added.)

*bedo-Dorado* doctrine and its ensuing aftershocks compel us to hold that petitioner had no true opportunity to raise the constitutional issue on appeal and that there could be no waiver. This case is thus distinguishable from *In re Shipp, supra,* 62 Cal.2d 547, and petitioner may therefore invoke *Escobedo* and *Dorado* and collaterally attack his judgment. (See *In re Spencer, supra,* 63 Cal.2d 400, 406.)

The writ is granted and the judgment and sentence for violation of section 11501 of the Health and Safety Code is set aside. Petitioner is remanded to the custody of the Superior Court of Los Angeles County for a new trial.

FRIEDMAN, J.—I concur. Justice Regan's opinion fully demonstrates the constitutional error which characterized petitioner's conviction and its availability as a basis of collateral attack on that conviction. I am troubled, however, by the obtrusive demands of article VI, section 13, of the California Constitution, which prohibits reviewing courts from setting aside convictions unless error has caused a miscarriage of justice. This salutary prohibition applies in habeas corpus as well as appellate review. (*In re Spencer,* 63 Cal.2d 400, 404-408 [46 Cal.Rptr. 753, 406 P.2d 33]; *In re Winchester,* 53 Cal.2d 528, 531-532 [2 Cal.Rptr. 296, 348 P.2d 904].)

Aside from petitioner's incriminating statements to the police, independent evidence fully demonstrated his guilt. He was caught *in flagrante delicto,* driven in an automobile by a plainclothes officer of the Los Angeles Police Department in company with an informer, directing the officer to the haunts of heroin peddlers and fetching the officer heroin in return for money. He was a commission man who, for each transaction, kept one balloon of heroin for his own use. At the trial the officer testified in detail. The four balloons sold the officer—one red, one blue and two yellow—were admitted in evidence. Petitioner's plea of innocence was apparently premised on the hopeless notion that he maintained no stock-in-trade and "sold" no heroin, but was only a go-between.

The case was tried before a judge sitting without a jury. Putting the confession to one side, the trial court could acquit petitioner only on the unsupported assumption that the plainclothes officer was committing elaborate perjury or an egregious error of identity. (Petitioner is a physically handicapped person.) If endowed in 1963 with a presentiment of the 1964-1965 *Escobedo-Dorado* development, the prosecutor would doubtless have avoided the confession as a plague. It

was no more needed than Jack Ruby's admission that he shot Oswald.

Petitioner's statements formed a confession of guilt, not an exculpatory claim. California decisions during 1965 and 1966 classified erroneous admission of *Dorado*-type confessions as prejudicial error *per se,* requiring reversal without regard to the presence of independent evidence of guilt.[1] On February 20, 1967, the federal Supreme Court announced its decision in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. That case holds in effect: (a) although some constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error,[2] there are other constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the federal Constitution, be deemed harmless, not resulting in automatic reversal; (b) before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt.

The *Chapman* case neither expressly nor implicitly insulates California courts from obedience to article VI, section 13, of the California Constitution. It means only that, in pursuing the inquiry enjoined by the state Constitution, California courts shall observe the "reasonable doubt" test rather than the standard California test of "reasonable probability" where there is federal constitutional error. (See *People* v. *Charles,* 66 Cal.2d 330, 337, fn. 10 [57 Cal.Rptr. 745, 425 P.2d 545].)

The California Supreme Court has declared that the harmless error test of Chapman should be utilized in determining the reversing effect of a *Dorado*-type confession. (*People* v. *Talley,* filed Apr. 12, 1967, 65 Cal.2d 830, 840, fn. 5 [56 Cal.Rptr. 492, 423 P.2d 564].) In another post-*Chapman* decision, the court indicated that the *effect* of the confession, not the reason for excluding it, is the reversal-impelling

---

[1]*People* v. *Dorado,* 62 Cal.2d 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Schader,* 62 Cal.2d 716, 728 [44 Cal.Rptr. 193, 401 P.2d 665]. The rule of automatic reversal was subject to a narrowly defined exception where a valid confession was followed by an invalid confession. In that narrow situation inquiry into prejudice was permissible. (*People* v. *Jacobson,* 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter,* 63 Cal.2d 386, 398 [46 Cal.Rptr. 622, 405 P.2d 862].)

[2]At this point, the *Chapman* v. *California* opinion furnishes three examples—coerced confessions, right to counsel and right to an impartial judge.

factor. (*People* v. *Spencer,* filed Mar. 14, 1967, 66 Cal.2d 158, 163, fn. 2 [57 Cal.Rptr. 163, 424 P.2d 715].) Such statements seem to imply that the rigidities of automatic reversal will no longer be imposed upon reviewing courts in those relatively few cases where the confession is ineffective, and damning independent evidence leaves no reasonable doubt of the confession's harmless effect upon the fact trier.

Generally, of course, a confession is so persuasive of guilt that a reviewing court cannot regard it as an inconsequential element in the trial court adjudication. (*People* v. *Jacobson, supra,* 63 Cal.2d at p. 330.) As we pointed out in *People* v. *Janssen,* 238 Cal.App.2d 106, 109-111 [47 Cal.Rptr. 453], an exceptional situation occurs when the defendant is caught red-handed and his confession becomes ''a wisp of straw tossed on a mountain of incrimination'' (p. 111). Such an exceptional situation would permit a reviewing court to measure the confession's effect upon the trial court proceedings in the light of the *Chapman* criterion.

To discard the rigid rule of automatic reversal in favor of the *Chapman* test promotes public security without encouraging violations of suspects' constitutional rights. Trial court exclusion of illegally obtained evidence plus appellate reversal of convictions influenced by such evidence fully curb unconstitutional enforcement practices. Wise and careful appellate utilization of prejudicial error standards represents the single best means of accommodating the wholesome demands of the Bill of Rights to the realistic administration of criminal justice. The costs of the Bill of Rights will be better understood and more readily borne if they are not needlessly inflated by the drily logical extensions of court-made doctrine.

We need not indulge in the ''implicit assumption that the same harmless-error rule should apply indiscriminately to all constitutional violations.'' (*Chapman* v. *California, supra,* Stewart, J., concurring [17 L.Ed.2d at p. 722].) There is a great deal of difference between the nastiness of a coerced confession and the infirmity of a voluntary one which became unlawful only by subsequently developed standards and was not so heinous as to evoke unlimited retroactivity.[3] The differ-

---

[3] Thus, *In re Lopez,* 62 Cal.2d 368, 377 [42 Cal.Rptr. 188, 398 P.2d 380], characterizes the *Escobedo* case in these terms: ''The [federal Supreme] court sought to discourage oppressive police practices; it did not seek to undo the procedures of yesterday, which despite their undesirability did not necessarily cause the conviction of the innocent.'' The quoted statement aptly characterizes the case at hand. The relationship between retroactivity and reversibility becomes evident at this point.

ence between these two kinds of confession reduces to pure speculation any notion that the federal Supreme Court may in the future classify both as reversible error *per se.*

Nevertheless, the post-*Chapman* decisions of the California Supreme Court offer no assurance of change in the doctrine of automatic reversal. In two cases the court has simultaneously applied the *Chapman* test and the rule of automatic reversal. (*People* v. *Talley, supra,* 65 Cal.2d at pp. 840-842; *People* v. *Hines,* filed Apr. 5, 1967, 66 Cal.2d 348, 354-355 [57 Cal. Rptr. 757, 425 P.2d 557].) The dual approach is workable only when both lead to the same result. At least three other decisions seem to augur continued adherence to the prejudicial error *per se* doctrine. (*People* v. *Spencer, supra,* 66 Cal. 2d at pp. 163-165; *People* v. *Davis,* filed Mar. 14, 1967, 66 Cal.2d 175, 182 [57 Cal.Rptr. 130, 424 P.2d 682]; *People* v. *Stout,* filed Mar. 16, 1967, 66 Cal.2d 184, 195-196 [57 Cal.Rptr. 152, 424 P.2d 704].) Whatever future decisions may hold, I do not believe that California law yet permits intermediate appellate courts to apply any rule other than that of automatic reversal when *Dorado*-type error is present. Thus I reluctantly concur in granting the writ.

PIERCE, P. J.—I concur. Justice Regan's opinion sets forth the facts and applicable law accurately. Justice Friedman's opinion states what I think the law ought to be. Unfortunately rigidity of the "prejudicial per se" rule—and the obligation of this intermediate appellate court to follow binding precedential rules by our higher Supreme Court—requires me to concur ineluctably, reluctantly, deferentially.

Respondent's petition for a hearing by the Supreme Court was denied July 19, 1967. Burke, J., was of the opinion that the petition should be granted.

---

Perhaps the criteria of complete retroactivity should be the measuring stick of automatic reversibility. (See *In re Lopez, supra,* 62 Cal.2d at pp. 376-377.)