[Crim. No. 580.   Fourth Dist.   Apr. 21, 1947.]

THE PEOPLE, Respondent, v. J. C. CAPE, Appellant.

Tom Okawara for Appellant.

James M. Thuesen, District Attorney, and N. Wendell Hansen, Deputy District Attorney, for Respondent.

BARNARD, P. J.—On the evening of May 10, 1946, a fire occurred in the plant of the Roeding Fig & Olive Company in Fresno, causing a considerable amount of damage. The defendant was charged with the crime of arson on the theory that he started this fire. Having been found guilty by a jury and sentenced to imprisonment, he has appealed from the judgment and from an order denying his motion for a new trial.

There is little dispute as to the main facts although the appellant has denied at all times that he started this fire.

His sole contention on this appeal is that the evidence is not sufficient to sustain the verdict and judgment. While it is admitted that he was found at the scene of the fire, it is argued that there is no evidence to show his participation therein and, further, that the evidence discloses that he was so drunk at the time that he could not have had the necessary intent.

The Roeding plant, where the fire occurred, consists of a number of buildings, all within an enclosure surrounded by a fence. The California Packing Corporation's plant adjoins it on the north. About twenty minutes before the fire alarm was turned in two witnesses observed the appellant walking along the platform at the California Packing Corporation's plant. They saw him get up on a machine standing on this platform, climb from there over a fence topped by strands of barbed wire, and jump down into the yard of the Roeding plant. A few minutes later he was seen by the night watchman inside one of the buildings of this plant. The doors of this building were all locked. Among other things, there was a row of fumigating rooms in this building, which were about twelve feet high and built against the outside wall of the building. There was an open space between the ceilings of these rooms and the roof of the building, in which a quantity of paper, old lumber and cartons were stored. There was a ladder reaching from the floor of the building to the top of these rooms, giving access to this space. At the time in question, because of certain repairs being made, a section of the outside wall had been removed near the top and slightly to one side of these fumigating rooms, leaving a hole which was about twelve feet from the ground on the outside. There was a scaffolding which made it possible to enter the building through this hole and thus reach the top of these fumigating rooms. The only reasonable inference from the evidence is that the appellant entered the building in this manner.

The fire alarm was turned in at 6:53 p. m. on this evening by people on the outside who saw the smoke. Shortly before that, at ten minutes to seven, the watchman in this building saw the appellant come down the ladder from the top of these fumigating rooms. When he first saw him, the appellant was just starting down this ladder. To his questions as to what he was doing there, the appellant replied: ''I took little sleep up there.'' The watchman took the appellant into the office and called the police. Shortly thereafter, the watchman

saw smoke and then observed the fire. The first fire was "right on top of the fumigating room—the place where he was coming down from."

The fire marshal arrived three minutes after the alarm was turned in, and saw the appellant at once. He testified that he asked the appellant why he had set fire to the plant and "he didn't make any answer at all, merely shrugged his shoulders." Half an hour later, at a fire department office, this witness asked the appellant what he was doing there and he denied that he had been there at all. When asked why his shirt was so dirty he said that while coming to town with his brother-in-law they had had car trouble and he got his shirt dirty while fixing the motor. This brother-in-law stated that they had no car trouble while coming to town. For several hours that evening the appellant was questioned by the fire marshal, an inspector for the board of fire underwriters, the district attorney, and others. To these officers the appellant told a number of varying and fantastic stories. He first said he met a couple of men who took him to a hotel room where they offered to pay him $300 to go over and set fire to the Roeding plant; that when he refused to do this they beat him up; and that, when he came to, he found the hotel on fire and he barely escaped with his life by stumbling downstairs. He then told of meeting a man in a bar who offered him $200 if he would burn this packing house and when he refused the man struck him and gave him a black eye. Incidentally, he had a black eye when arrested. He then told a number of stories as to where he had been on that day. He then said that he had become sleepy and gone to a hotel; that he climbed the fence in order to go in the back way and get into the lobby of the hotel; that the clerk took him upstairs to see if the room was satisfactory; that while he was there another man came in and offered to give him $300 to burn the hotel; that when he refused he was struck in the eye and knocked down; and that when he awoke the place was afire. Later he said he remembered climbing over the fence to go to sleep but that he was not sure whether it was a hotel or a packing house, and that when he woke up the place was afire.

A few months before this fire the appellant pleaded guilty to manslaughter, having killed a man while driving an automobile while under the influence of liquor. He was given probation, one of the conditions being that he let liquor alone,

and not frequent places where it is sold. While being questioned on the evening of the fire he said he would tell the truth to the probation officer if he was called. The probation officer was called and was allowed to talk to him privately. To the probation officer he told several different stories about being offered $300 to start fires in rooming houses and seeing other men start such fires. Later that night, a statement was taken down by a shorthand reporter, the questions being asked of the appellant by the district attorney. This statement covers twelve pages of the transcript. It is mainly significant in that the appellant freely answered a large number of questions which could have no important bearing on this case and refused to answer practically all questions with respect to his acts or conduct having any relation to this fire. He even refused to answer the question as to whether or not he had started this fire. Although he was clearly relying more upon his own ability and cleverness than upon the truth and his innocence, he handled himself throughout the taking of this statement with an unusually high degree of ability. As one witness who was present on that occasion said: "His attitude was that of a sea lawyer; he knew more about the law than the district attorney."

On the next day, after the fire, the officers took the appellant to the Roeding plant. He admitted climbing a fence into the grounds and when shown the ladder to the top of the fumigators admitted that that was the ladder he climbed down, and that that was where the watchman "grabbed him." He then told the officers "that he was just drunk and didn't know what happened." In several conversations over the next two or three days he repeated some of the stories above set forth.

The appellant took the stand at the trial. He testified that on the afternoon preceding the fire he was drinking, that he drank from 20 to 24 "beers," and that each time he drank beer he also took a drink of whiskey. He then said he remembered walking along the California Packing platform and climbing over this fence into the grounds of the Roeding plant, that he went in there for a purpose private to himself, and that he remembered being over by one of the buildings. When asked if he went inside a building he replied: "When I was around in this yard I just kind of blacked out. I got there. Next that I remember I was inside the packing shed." He then testified that when he found himself inside the building

he walked down a hallway trying to get out of the place; that he heard some men talking and went back in the hallway; that he was standing by this ladder when the night watchman "come up and got me"; that he did not recall climbing up any scaffolding and crawling through an opening into the space above the fumigating room; that he did not recall climbing down a ladder just before the watchman found him; and that he was just standing at the foot of the ladder when the watchman came. When asked whether he had been up over the fumigating room, he replied: "Not that I know of." He then said that the next thing he knew he was in a room at the city hall; that he did not remember having any conversation with the district attorney or other officers that night; and that he did not remember being taken to jail. The story told by the appellant on the stand was quite different from any of the stories he had previously told to the officers. On cross-examination, he was asked whether he had ever told any of the officers, either that night or afterwards, the story he told on the stand. He replied that he had not. When he was asked "Why didn't you?" he replied: "Well, just the very thing I told you there, you wanted me to plead guilty. And in order to get these sentences to run concurrently I refused to do it."

The appellant's main contention is that he was so drunk that night that he could not know whether or not he started this fire; that it follows that he could not have had the necessary criminal intent; and that the fantastic stories told by him that night were the ramblings of a drunken mind and, therefore, not of a character to show a consciousness of guilt. However, in attempting to support this theory on the witness stand the appellant overdid the matter. If it could be assumed that a man could consume the amount of liquor the appellant said he did within the time stated, it would be obviously impossible for such a man immediately thereafter to climb this fence, to climb the scaffold, to get safely down the ladder, and then to be in such possession of his faculties as is disclosed by this record. While there is evidence that after his apprehension and while he was being questioned the appellant had a smell of liquor about him, with some evidence from which drunkenness could be inferred, the great preponderance of the evidence is that he did not appear so drunk as to stagger or to be incoherent of speech, that he was able to talk intelligently before and immediately after

the fire was discovered, and that he did so thereafter when it suited his purpose. The wild tales that he told that night indicate an imaginative mind and a design to conceal the truth, rather than the drunken stupor of one who does not know what he is doing or saying. It is not without significance that even while fabricating these stories, with the apparent purpose of covering up or avoiding the necessity of other explanation for his activities and for his presence at the spot where the fire started, his mind was so taken up with the matter of the intentional starting of fires that he made arson the central theme of all of his stories. A wide distinction is clearly observable between these stories and his conversation shortly after he was arrested, at times while he was being questioned, and especially at the time his statement was taken down by a shorthand reporter. According to his contention he remained so drunk all of that evening that he did not know what he was doing and he testified that he could not even remember that he was asked questions by the district attorney in the presence of a reporter, and could not remember being later taken to the jail. On the other hand, that statement discloses that the appellant then had a very keen mind and that he knew exactly what he was saying and why he was saying it. It very clearly appears that while that statement was being taken the appellant was not drunk enough to interfere with the very active and skillful use of his mental faculties. Moreover, he was not drunk the next few days while he was in jail, nor while he testified as a witness in the trial of this action.

It was rather clearly shown that this fire was of incendiary origin. It clearly appears that it did not start from electric wires, which were in metal conduits. Spontaneous combustion was eliminated as a cause. The only reasonable inference from the evidence is that it was started by the appellant. While the question of his criminal intent in doing so rests entirely upon circumstantial evidence that evidence is quite strong. The appellant had not only effected entrance into this locked building at night but he was seen coming from within a few feet of where the fire started, just three minutes before the fire was observed. This spot is one which could hardly have been approached by mistake. The attempted explanations for his presence at the place the fire started at about the time it must have started, both that night and later,

were far from satisfactory. It was clearly established that some of appellant's statements on material matters were false. Some things he at first denied were later admitted. His testimony at the trial was such that it was obviously impossible for the jury to believe it. His statements and attitude on the witness stand, and when he was being questioned on the night of the fire before a court reporter, are not those which would naturally be expected from an innocent man. It rather clearly appears that he was greatly concerned on the night of the fire with the effect this matter might have on his previous release on probation. In view of this fact his statement on the witness stand, in reply to a question as to why he had not told the same story before, that he had refused to plead guilty "in order to get these sentences to run concurrently," is not only close to an admission of guilt, but it furnishes a more probable explanation of the reason for his fantastic stories than the one that he finally gave, that as a result of drink he "blacked out" during the critical few minutes in which the fire was started, and that he neither knew how he entered the building nor what he did there. The implied findings of the essential facts, including the criminal intent, are sufficiently supported by the evidence and by the inferences which may reasonably be drawn therefrom.

The judgment and order are affirmed.

Marks, J., and Griffin, J., concurred.