[Crim. No. 4546. Second Dist., Div. One. Mar. 7, 1951.]

THE PEOPLE, Respondent, v. CHARLES HUBLER, Appellant.

690

Al Matthews, Doris R. Baker, Harold J. Ackerman and Robert P. Dockeray for Appellant.

Fred N. Howser, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information containing four counts filed by the District Attorney of Los Angeles County, defendant was charged in Count I with the crime of kidnapping; in Count II he was accused of the crime of robbery; Count III charged the crime of assault with a deadly weapon with intent to commit murder; and in Count IV he was accused of the offense of assault with intent to commit rape. To all of the aforesaid charges defendant entered a plea of not guilty, and the cause proceeded to trial before a jury. At the conclusion of the testimony, on motion of the district attorney, Count IV of the information was dismissed.

By the jury's verdict the defendant was found guilty as charged in Counts I, II, III. Count III was reduced to the

crime of assault with a deadly weapon. Motion for a new trial was denied. From the judgments of conviction, defendant prosecutes this appeal.

Stating the facts in a light most favorable to the prosecution as we are required to do following a guilty verdict, we find in the record testimony that on March 4, 1950 at about 8:30 p. m. the prosecuting witness, a 23-year-old woman, was accosted by defendant near the intersection of Liberty Boulevard and Beechwood Avenue in the city of Southgate, Los Angeles County. She had departed from her home about 8:20 p. m. to board a bus. She first noticed defendant across the street from her on Liberty Boulevard as she walked towards the bus stop. She noticed that this man was wearing a light jacket and dark trousers. The area was well lighted. As she crossed Beechwood Avenue she heard footsteps behind her but continued walking on Liberty Boulevard. She moved over to allow the person behind her to pass. As this individual passed her, she noticed he was the same man whom she had previously seen on the opposite side of the street. This man, identified by the complaining witness as the defendant herein, turned and stopped the complainant by pointing a small nickel-plated revolver at her. According to her testimony, she tried to scream but was unable to do so because she was "paralyzed with fear." Defendant stepped forward and grabbed her right arm, held the gun against her side saying, "Don't scream or I'll shoot." He further stated, "I won't hurt you. I just want to suck your tits." Shortly thereafter defendant suggested sexual intercourse and the complaining witness refused. Defendant then forced her to walk with him on Liberty Boulevard in an easterly direction to the northwest corner of the intersection at Beechwood Avenue. At this point they crossed Liberty Boulevard and continued walking on the avenue. Defendant took a more firm grip upon the complaining witness's arm, stating, "If you try to scream or back away I'll shoot." Defendant inquired where the complainant lived to which she answered that she lived nearby and requested him to release her. They turned the corner at Poplar Place and continued walking near the school grounds. At the end of this street there is situated a garage and a motel. Defendant stated to the complainant that he could not let her go because he "might get caught." He stated further that he could not trust anyone. According to her testimony the complaining witness was thoroughly frightened and hung back.

Defendant turned her around and "coaxed" her to go in an easterly direction. Again she drew back and he stated that he would not harm her.

Suddenly, standing very close to the complainant and facing her, defendant started unbuttoning her blouse. Becoming impatient he ripped the blouse open and inserted his hand inside her brassiere. Again defendant made suggestive statements of a sexual nature. During all of this time, according to her testimony, the witness was in fear of the defendant. He walked her across a parking lot beside the motel. He continued to hold her arm and point the gun at her side. He walked her to the rear of the motel. The witness testified, "I still wouldn't look at him. I was trying to think of some way to get away and I was paralyzed. I just couldn't move or speak or anything, and as I stood there out of the corner of my eye, I saw the flash of the gun as he raised it past my right temple and from the position of it I knew *instinctly* he was going to strike me and I put both hands up to protect my head and I screamed and he struck me and I remember being struck twice before I lost consciousness and that is all I remember."

A few minutes later, she regained consciousness, arose and walked across the parking lot to the motel office where she called the police.

The complainant was taken to the Maywood Hospital where a bullet was removed from her brain and where she received treatment for a fractured finger. As a result of the bullet wound, the complaining witness suffered a ruptured macula of the left eye destroying the power to focus that eye. Complainant testified that she was with the defendant for about 10 minutes before she was shot.

Prior to the time she was accosted by defendant the complainant was carrying a "purse and a present." The purse was black in color and inside thereof was a smaller red purse or wallet containing $11. She did not see either the purse or the wallet again until the police later returned them to her. When she regained consciousness at the scene of the crime both purses were missing. None of the money was ever recovered.

At the trial the complaining witness positively identified defendant as the man who accosted and shot her and also recognized a jacket introduced at the trial as being similar to the one worn by defendant on the night in question.

A young boy testified that he found the complainant's small red wallet beneath a railroad culvert the day after the attack upon the complaining witness took place. This culvert was about five or six blocks east of the aforementioned motel. The youth was walking along the tracks when he noticed the red wallet beneath the culvert and retrieved it. He testified that he noticed no other objects in the immediate vicinity and that there was no money in the wallet.

A deputy sheriff testified that a jacket taken from the defendant's room at a college in San Luis Obispo was the one heretofore referred to as having been identified by the complaining witness as being similar to the one worn by her assailant.

The same deputy sheriff had two conversations with the defendant concerning the matters here involved. When the officer began his conversation with the defendant the latter immediately asked if they were immigration authorities. Upon receiving a negative reply he asked if he was being arrested for burglary. In conversation with deputy sheriffs defendant told them he had enrolled in the San Luis Obispo college on Wednesday, March 8, but had been at the college since the preceding Sunday, March 5. When asked when he retired on March 4, the defendant answered, "No, no, no you don't. I won't talk about it, and besides I was home that night." Although defendant freely answered questions concerning his actions during a few months prior to March 4, when direct questions were addressed to him concerning the evening of March 4 he refused to discuss the matter at all. In a subsequent conversation, defendant denied having seen the complaining witness on March 4 and stated that he had an alibi for that night. Finally, however, defendant said he was at a lady's home on the evening in question.

On April 1, a deputy sheriff took the defendant to the home of a girl with whom he claimed to have been on March 4 from 7:30 to 11 p.m. He told the officers to go upstairs to a certain door and they would find Alice Sims to be the girl. The officers went to the apartment and when they returned to the police car advised defendant that the information they had was that he never spent an evening alone with that girl. They stated that they had information that this girl was afraid of defendant, to which he replied, "So that's what it is." The fact was, however, that the officers had no conversation with Alice Sims because she was not at home, but they talked to her sister.

At the trial Alice Sims testified that she knew defendant but that he was not in her company on March 4, 1950, between the hours of 6 p. m. and 12 midnight. Cross-examination revealed that he had been in her company on other occasions and that she was not afraid of him.

When officers confronted defendant with the complainant and she accused him of committing the crimes charged against him, the latter said nothing in answer to her accusations.

Testifying in his own behalf, defendant stated that on March 4, 1950, at approximately 8:30 p. m. he was in the home of Mrs. Louise Turner watching television. He flatly denied all of the charges against him. On cross-examination he testified that he told the officers he was with Alice Sims on Saturday, March 4, but he meant the previous Saturday. With reference to the date of March 4, defendant testified that he did not leave the premises of the Turner residence at any time except to go to the store, which was around 4:30 or 5:30 p. m.

Defendant's mother testified that on the date charged in the information he was at the Turner home watching television. She recalled this date because he remarked that a cowboy picture had been the best one he had ever seen. That the time was 8:30 p. m. This she remembered because of the next program she watched which started at 9:30 p. m. The witness testified that they watched the television until 10:30 p. m.

Mrs. Turner testified that defendant and his mother lived with her in her apartment. That on March 4 defendant was in the house watching the television and she recalled that at 7:30 p. m. and again at 9:30 p. m. specific programs were watched and that she discussed the programs with the defendant.

In rebuttal, Officer Outhouse testified that on March 30 he had a conversation with Mrs. Turner at her home in which she was asked if there was a blue Plymouth coupé at her house, to which she answered in the affirmative. She stated that it had been there approximately a month. That it had been brought there on the night of the first Friday in March, 1950, which was the 3d. The witness stated that defendant had driven the car on a Saturday before he went to school. The officer testified that upon checking the calendar, Mrs. Turner agreed that the Saturday in question was March 4. When asked at what time the car left the premises, the officer testified that the witness stated that defendant merely started

the car, went out for a few minutes and brought it back because it was not operating right and that defendant then left in his truck. The officer further testified that when asked what time defendant left the place she stated she did not recall the time of day but that it was shortly after dark. When asked what time defendant returned to her residence she stated she didn't know what time he returned but he had not returned when she retired at about 11 o'clock.

Appellant concedes that the evidence is sufficient to support the convictions of the crime of kidnapping as charged in Count I, and the crime of assault with a deadly weapon, a lesser and necessarily included offense within the crime charged in Count III. His sole contention on this appeal is that the evidence is insufficient to support the conviction of the crime of robbery, as charged in Count II of the information. In this regard, appellant urges "that there is no evidence sufficient to establish the fact that the defendant was the person who removed the purse from the immediate presence" of the complaining witness. That the victim did not see appellant take the purse from her possession. That it was not found in his possession, but was later found under a railroad culvert, a few blocks away from the scene of the crimes.

In 46 American Jurisprudence 162, it is said, "Under the rule that all the elements of the corpus delicti may be proved by presumptive or circumstantial evidence, which prevails in most jurisdictions, it has been held that the commission of a robbery is sufficiently established by proof that the victim had valuables on his person at the time of being assaulted, beaten, and rendered unconscious, and that they were missing when he regained consciousness."

In the instant case, the jury was entitled to draw an inference from the facts legally proved, and on such a deduction from those facts as is warranted by, among other considerations, the usual propensities or passions of people and the course of nature (Code Civ. Proc., §§ 1958, 1960).

Under the facts proven herein it was only reasonable for the jury to assume and infer that after the assault upon the complainant and while she was unconscious, the perpetrator of the assault took the personal property from his victim. It is only reasonable to assume, in the light of human experience and the propensities of people, that had some other person seen the complaining witness lying bloody and unconscious upon the ground, such a person would have

come to her aid. The inference drawn by the jury was the only reasonable inference that could be predicated upon the proven facts with which we are confronted in the case at bar.

■ It is not within the province of an appellate tribunal to retry the case and to make inferences from the facts proved. That function belong to the trier of facts. ■ The appellate court is limited to deciding only whether upon the face of the evidence it can justly be held that sufficient facts could not have been found to warrant the inference of guilt (*People v. Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]). ■ And, "we must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether such facts are sufficient to support the verdict" (*People v. Newland, supra,* p. 681).

Being unable to say that upon no hypothesis whatever is there substantial evidence to support the verdict and conclusion of the jury, the judgments and each of them must be affirmed. It is so ordered.

Drapeau, J., and Hanson, J. pro tem., concurred.

A petition for a rehearing was denied March 19, 1951.