[Crim. No. 3591. Third Dist. Apr. 29, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES ALLEN ANDREWS, Defendant and Appellant.

Willard Weddell, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

SPARKS, J. pro tem.*—In appealing from the judgment defendant raises three assignments of error: (1) that the corpus delicti of the offenses charged was not proven to a moral certainty and beyond a reasonable doubt; (2) that the constitutional rights of defendant were infringed by the submission of the case on the transcript of testimony taken at the preliminary examination; and (3) that his constitutional rights were violated when law enforcement officers were permitted to take oral statements from him in the absence of counsel. We have examined each of these specifications and have concluded that number (3) thereof has substantial merit and requires a reversal of the cause by reason of the holdings in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal. Rptr. 201, 400 P.2d 97]. Since the case may be retried, we state our views also on assignments (1) and (2). To make clear our conclusions a history of the facts and circumstances surrounding the commission of the crimes leading to defendant's arrest and conviction will be related.

On December 24, 1962, a fire broke out on the rear porch of a two-story hotel and rooming house, frame construction, located at 699 El Camino Avenue, in North Sacramento. The porch contained some laundry trays, toilet, tub and a few articles of furniture and appliances. There was also a 5-gallon tin can used for disposal of papers, packages and other waste.

The fire was discovered by Owen J. McKeel, the owner of the premises. It was his custom at intervals during the night to make routine inspections of his hotel. He had been on the back porch about 2:30 or 3 a.m. and found everything normal. About an hour later, when he reached the doorway

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

leading to the porch, he was driven back by flames. The fire department was called and responded promptly to the alarm. Through its efforts the fire was controlled and extinguished in approximately an hour. Louis Cassaglia, Chief of the North Sacramento Fire Department, attended the fire personally and later investigated its origin. He testified that there was no evidence of storage of inflammable liquids in the area, that the electrical wiring was encased in conduit, that a gas heater was properly vented, and that neither the electrical wiring nor the gas heater had had any bearing on the fire; that the weather on the particular morning was cold, foggy and misty. It was his opinion that the chances of the fire being spontaneously ignited would have been one in a thousand, ''if there was any chance at all.'' Guy Donald Chapin, the chief building inspector of the city, also examined the premises after the fire. He testified that there was no indication that the fire was caused by defective wiring or improper gas vents or defective appliances of any sort.

The second fire occurred four days later on the premises of Mr. and Mrs. Heminger, at 591 Redwood Avenue, in North Sacramento, about 1 a.m. Mrs. Heminger had gone into the kitchen for a drink of water. Looking out the rear window she discovered that the garage was on fire. She awakened her husband. When he went outside the whole garage was on fire, and the firemen were already there. The garage was detached from the house. In it were stored miscellaneous articles of household furniture, garden tools, firewood and boxes of paper. There was no gasoline, kerosene, or anything of that nature in the garage. An electric light was operated by a switch. There were no gas appliances. A driveway from the street led to the garage which was located to the rear of the dwelling house. The garage doors were customarily left unlocked and one of them was left ajar.

Fire Chief Cassaglia, who also attended this fire, found the entire roof area and rear wall engulfed in flames when he arrived. He testified that the origin of the fire had to be in the rear of the building, and that there was no wiring in that end. He also testified: ''[T]here is a fire I would personally discount as being able to start spontaneously. The materials that I found there and in analyzing the stored materials, nothing would lend itself towards spontaneous ignition.'' At that early morning hour the weather was cold, damp and very foggy. The chief building inspector was also called to examine the premises after the fire and could find

no indication that the fire was caused by defective wiring or appliances of any sort.

The third fire charged against defendant was on the front porch of a dwelling occupied by Thomas J. McCallister, at 545 Eleanor Street, in North Sacramento. Like the preceding ones, this fire occurred in the early morning hours, around 3 or 3:30 a.m. The date was January 7, 1963, and the weather was cold, damp and foggy. When Mr. McCallister discovered the fire at one end of the front porch, the flames were shooting up the front wall of his home. He called the fire department and then attempted to halt the spread of flame by using a garden hose. At the time he smelled something like paraffin burning. The firemen arrived in about 10 minutes and proceeded to extinguish the blaze. There had been a couch on the porch with two folded rugs on top and a polyethylene cover to keep off the rain. The couch had been pretty badly consumed by the fire, and the rugs were also burned on one end. The porch light and wiring were on the other end of the porch and were not involved in the fire. There was no gasoline, kerosene or other fuel on the porch. Warren Jones, the assistant fire chief, who investigated the fire and damage caused by it, found that it had originated at the extreme end of the porch where there was the greater charring or "alligatoring" of the wall. The porch floor had been completely burned through at that point. He testified that there was no gas line or electric wiring involved, and that there was no chance of the fire having been caused by spontaneous combustion. Again, the chief building inspector was called to examine the premises and could find no cause of fire attributable to defective wiring or appliances.

Two days subsequent to the last fire, that is, on January 9, 1963, the defendant, at the Sacramento County Jail, in an interview with Bill Deasy, an investigator employed by the Sacramento district attorney's office, and John Riggs, a state parole agent, admitted that he had set all three of the fires. When asked for his reason, he said that "he builds up a lot of animosity towards people and that to relieve this animosity, it would be the same as somebody punching somebody in the face or kicking a dog." A second confession, substantially the same as the first, although in somewhat more detail, was taken from the defendant on January 14, 1963, in the statement room of the district attorney's office.

From this background of undisputed fact, we will consider first the challenged insufficiency of the evidence to establish

the corpus delicti of the crimes charged. Appellant argues that in order to prove the corpus delicti of arson, the burden was on the prosecution to negate all possible ways in which the fires could have been started other than by incendiary means. Although appellant concedes that the evidence did rule out three types of nonincendiary blazes, that is, spontaneous fires, electrical fires and those resulting from defective gas appliances, he nevertheless contends that there could have been other possible causes of the fires in question, such as mice igniting matches, a carelessly dropped cigarette, sparks from automobiles (exhaust), etc.

The proposition that it was incumbent on the prosecution to rule out all possible or imaginary causes of the fires cannot be upheld. It is well established that the corpus delicti of a crime is sufficiently proved if the elements of the offense as defined by statute are shown to exist. (*People* v. *Clagg*, 197 Cal.App.2d 209, 212 [17 Cal.Rptr. 60]; *People* v. *Sherman*, 97 Cal.App.2d 245, 249 [217 P.2d 715]; *People* v. *Hays*, 101 Cal.App.2d 305, 311 [225 P.2d 600].) When the requisite elements of the crime are established with sufficiently convincing proof, the corpus delicti is complete although the perpetrator may be unnamed. (*People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Amaya*, 40 Cal.2d 70, 76 [251 P.2d 324].) In California the corpus delicti of a crime may be proved by circumstantial evidence and by the reasonable inferences which may be drawn therefrom. (*People* v. *Ives*, 17 Cal.2d 459, 463 [110 P.2d 408]; *People* v. *DuBois*, 16 Cal.App.2d 81, 86 [60 P.2d 190]; *People* v. *Black*, 103 Cal.App.2d 69, 74 [229 P.2d 61]; *People* v. *Mercer*, 103 Cal. App.2d 462, 465 [229 P.2d 411]; *People* v. *Westfall*, 198 Cal.App.2d 598, 601 [18 Cal.Rptr. 356].) This rule applies to arson cases (*People* v. *Cape*, 79 Cal.App.2d 284, 289 [179 P.2d 426]; *People* v. *Andrews*, 222 Cal.App.2d 242 [35 Cal.Rptr. 118]; *People* v. *Clagg*, *supra*), and there is, of course, no distinction in the quantum of proof required between direct and circumstantial evidence, so long as the reasonable doubt requirement is satisfied. (*People* v. *Kennedy*, 101 Cal.App.2d 709 [226 P.2d 359]; *People* v. *Hubler*, 102 Cal.App.2d 689 [228 P.2d 37].)

It is true that the statutory definition of arson (Pen. Code, § 447a)[1] requires that the act of setting fire to or burning

[1]Penal Code section 447a reads: "Any person who wilfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any trailer coach, as defined in Section 635

be done maliciously. The word "malice" imports "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, . . ." (Pen. Code, § 7, subd. 4.) When related to the crime of arson, the word "malice" denotes nothing more than a deliberate and intentional firing of a building, or other defined structure, as contrasted with an accidental or unintentional ignition thereof; in short, a fire of incendiary origin. (*People* v. *Clagg, supra; People* v. *Cape, supra.*) Common experience reminds one that such crimes generally are committed in stealth, without warning and *often under the cloak* of darkness. It is not surprising then that perpetrators of such clandestine acts frequently escape detection by human eye. Were it not permissible legally to prove the corpus delicti by circumstantial evidence, the prosecution of such offenses often would be well-nigh a hopeless undertaking.

Once before, but under different circumstances, we were called upon in this same case to give our views as to the sufficiency of the evidence to establish the corpus delicti. We refer to the appeal by the State from a judgment dismissing the information under section 995 of the Penal Code. (*People* v. *Andrews*, 222 Cal.App.2d 242 [35 Cal.Rptr. 118].) The issue presented on that appeal was whether or not the evidence at the preliminary examination was sufficient to establish probable or reasonable cause of the commission of the crimes charged and of defendant's guilt. The resolution of that issue depended entirely upon the question whether or not the corpus delicti had been proven sufficiently for the admission of defendant's confession. We appreciate that the appellate viewpoint in the former proceeding was not the same as at present, and for that reason what was said therein cannot now be positioned as the "law of the case."[2] Nev-

of the Vehicle Code, or any dwelling house, or any kitchen, shop, barn, stable or other outhouse that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, shall be guilty of arson, and upon conviction thereof, be sentenced to the penitentiary for not less than two or more than 20 years."

[2]In an appeal from a judgment of dismissal under section 995 of the Penal Code the reviewing court is only called upon to determine whether or not the holding order was supported by evidence showing reasonable or probable cause, that is, whether the magistrate, acting as a man of ordinary caution or prudence, conscientiously could entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated. (*Weber* v. *Superior Court*, 35 Cal.2d 68, 69 [216 P.2d 871]; *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 55 [216 P.2d 859].) In the present appeal we are concerned with the question whether or not the evidence was sufficient to sustain the judgment of conviction.

ertheless, since the instant cause was submitted by stipulation at the trial upon the transcript of the preliminary examination and no other evidence was introduced relating to the corpus delicti, we find the words of Mr. Presiding Justice Pierce in *Andrews, supra,* pertinent to, and aptly expressing our views on, the issues presently at bench (pp. 245-246):

"In all of the four fires[3] the usual causes of accidental fires —defective wiring, electrical or gas appliances, spontaneous combustion or careless (but not purposeful) ignition of flammable materials by others—all had been either absolutely ruled out or negated within the realm of reasonable probability. But more convincing were circumstances snapping the long arm of coincidence. Four fires within the same neighborhood, close in point of date (all fires occurred within less than two weeks), closer in point of time of day (middle of the night), all started by an apparently similar method, cumulate to give to this circumstantial proof much more than prima facie veracity.

"We have authority for our assertion that the cumulative factor is an important one. In *People* v. *Sherman,* 97 Cal. App.2d 245, 249 [217 P.2d 715] (hearing by our Supreme Court denied) and *People* v. *Hays,* 101 Cal.App.2d 305, 311 [225 P.2d 600], this factor was given consideration, although in those cases separate fires were set on the same premises.

"In Witkin, California Evidence, section 113, subdivision (3), page 136, it is stated: 'Circumstances which, taken singly, seem to afford no logical inference as to the issue, may when considered with other circumstances give rise to such an inference.'"

In conformity with these rules, there was no requirement that the whole gamut of speculative possibility as to the cause of the fires be run, and then each, in turn, be ruled out. ■ The corpus delicti will be proven sufficiently if the evidence shows beyond a reasonable doubt that the fires were of incendiary origin. Even the rigid requirement of the reasonable doubt rule stops short of absolute certainty, free of some possible or imaginary doubt, for as has been so often said, "such degree of proof is rarely possible." (CALJIC No.

---

[3]The allusion to "four fires" was based upon a charge in another count of the information of setting fire to an automobile. The defendant had admitted that he set this fire in the same manner as the others, i.e., by the use of a lighted cigarette. He was permitted to plead guilty to a lesser included offense, and so far as that count is concerned, it has been disposed of and is not before us on this appeal.

22; *People* v. *Eggers*, 30 Cal.2d 676 [185 P.2d 1]; *People* v.
*Kennelly*, 166 Cal.App.2d 261 [332 P.2d 733].)

 There was no error in the holding that the corpus
delicti of the offenses charged against defendant was suffi-
ciently established in order to admit his confessions.

Appellant's second point is based upon constitutional
grounds. He contends that his right to be confronted by wit-
nesses called against him was violated by the submission of
the case on the transcript of testimony taken at the prelim-
inary examination. The record shows that this method of
procedure was agreed upon in open court by stipulation of
counsel in defendant's presence. The actual words of the
deputy district attorney and of defendant's counsel were as
follows: "MR. REAGOR: ...It is my understanding that Mr.
McDonnell [defendant's attorney] wishes to stipulate, as do
I, that this matter be submitted to this Court on the basis
of the Preliminary Hearing transcript, each side reserving
the right to produce additional witnesses. Is that correct, Mr.
McDonnell? MR. McDONNELL: Yes, with the further stipu-
lation, of course, that it be understood that all objections
raised by the Defense during the preliminary examination
are, of course, raised for the purpose of this trial...."

The stipulation was then accepted by the court, and the
case proceeded without objection from the defendant. This
method of procedure is not novel in California.[4] In *People*
v. *Dessauer*, 38 Cal.2d 547 [241 P.2d 238], cert. denied 344
U.S. 858 [73 S.Ct. 96, 97 L.Ed. 666], the court stated (p. 552):
"...The right to be confronted by witnesses, whether assured
by Constitution or statute, may be waived, and a trial may
be had on the transcript of the evidence taken at the pre-
liminary hearing on stipulation by defendant and his counsel
(*People* v. *Wallin*, 34 Cal.2d 777 [215 P.2d 1]), or by the
latter's stipulation, at least when made in defendant's pres-
ence. [Citations.]" In *People* v. *Cohen*, 94 Cal.App.2d 451
[210 P.2d 911], it is said (p. 457): "It appears to be well-
established law that counsel has the right to stipulate relative
to any of the steps of an action or proceeding, particularly
where the stipulation was made in the presence of the accused

---

[4]For discussion see Witkin, California Criminal Procedure (1963)
section 355, page 346, where it is said, "It is not uncommon practice
for the defendant, on trial in the superior court after being held to
answer, to stipulate that a transcript of the evidence taken at the pre-
liminary examination may be introduced at the trial in lieu of the testi-
mony covered therein."

who made no objection to it. [Citations.] Moreover, it has been held that the right to be confronted by the witnesses against him is a personal privilege which may be waived by the accused, and such a waiver is accomplished when counsel for defendant stipulates that the evidence taken at the preliminary examination may be considered by the court as evidence at the trial. [Citation.]'' (See also *People* v. *Donnelly,* 95 Cal.App.2d 595, 597-598 [213 P.2d 502]; *People* v. *Ethridge,* 204 Cal.App.2d 279, 284 [22 Cal.Rptr. 57]; *People* v. *Sola,* 200 Cal.App.2d 593, 595 [19 Cal.Rptr. 327]; *People* v. *Smyer,* 177 Cal.App.2d 477, 478 [2 Cal.Rptr. 215]; *People* v. *Davis,* 157 Cal.App.2d 33, 34 [320 P.2d 88]; *People* v. *Heath,* 131 Cal.App.2d 172, 174 [280 P.2d 70]; *People* v. *Anderson,* 126 Cal.App.2d 702, 705 [272 P.2d 805]; *People* v. *Hart,* 121 Cal.App.2d 301, 302 [262 P.2d 865].) In *People* v. *Valdez,* 82 Cal.App.2d 744, at page 749 [187 P.2d 74], the court pointed out that the right of confrontation in its indispensable aspect was merely an application of the common-law rule against hearsay, and the constitutional right ''is confined to the guaranty of an opportunity for the cross-examination of the witnesses against the defendant. . . .'' The actual presence of the witnesses at the trial is merely a statutory right under subdivision 3 of section 686 of the Penal Code[5] and is subject to waiver. In the instant case the defendant was at the preliminary examination confronted by all the witnesses called against him, and his counsel was afforded the full right of cross-examination.

Appellant contends, however, that his right to be con-

---

[5]Penal Code, section 686, subdivision 3, reads as follows:

''3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness; or where the testimony of a witness on the part of the people, who is unable to give security for his appearance, has been taken conditionally in the like manner in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, the *deposition of such witness* may be read, upon its being satisfactorily shown to the court that he is dead or insane, or can not with due diligence be found within the state; and except also that in case of offenses hereafter committed the testimony on behalf of the people or the defendant of a witness deceased, insane, out of jurisdiction, or who can not, with due diligence, be found within the state, given on a former trial of the action in the presence of the defendant who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, may be admitted.''

fronted by witnesses at the trial could only be waived by himself personally and not through his counsel. In advocating this proposition he attempts to equate the requirements of waiver of a jury trial. To this proposition the Attorney General in his respondent's brief makes the following adequate answer: "... What appellant fails to recognize is that section 7 of article I of the California Constitution specifically provides that the waiver of a jury trial can only be made when there is 'expressed in open court by the defendant and his counsel' desire to waive a jury trial.'"[6] The cases relied upon by appellant, to wit: *People* v. *De Blasio,* 219 Cal.App.2d 767, 769 [33 Cal.Rptr. 473]; *People* v. *Holmes,* 54 Cal.2d 442 [5 Cal.Rptr. 871, 353 P.2d 583], acknowledge that the requirement of personal waiver of a jury trial emanates from the California Constitution. There is no similar provision in either the Constitution or statute regulating the procedure to be followed when preliminary examination transcripts are used at trials.

We hold, under the circumstances as shown here, that the stipulation of defendant's counsel made in open court and in the presence and without objection from the defendant that the case be tried upon the transcript of testimony taken at the preliminary examination was a waiver by defendant of his right to be confronted by witnesses at the trial and constituted no violation of his constitutional rights.

The final contention urged by appellant is that his constitutional rights were infringed because in the absence of counsel he was interrogated by law enforcement officers and his confessions obtained. In his brief he relies upon the decisions in *People* v. *Waterman,* 9 N.Y.2d 561 [216 N.Y.S.2d 70, 175 N.E.2d 445], and *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]. However, in the oral arguments consideration was given to the more recent holding of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], followed by the original opinion of our Supreme Court in *People* v. *Dorado.* Since then there has been filed the Supreme Court's decision upon its rehearing of the *Dorado* case (62 Cal.2d 338 [42 Cal.Rptr.

---

[6]The Constitution of California does not contain a provision that in the criminal prosecution the accused shall have the right to be confronted with the witnesses against him. (See Cal.Const., art. I, § 13.) The right of confrontation emanates from the Sixth Amendment to the United States Constitution and from Penal Code section 686. For discussion see *People* v. *Hart,* 121 Cal.App.2d 301 [262 P.2d 865].

169, 398 P.2d 361]), and still more recently the decision in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. The holdings in *Dorado* and *Stewart* are controlling upon this appeal; the judgment in the instant case being under direct, rather then collateral, attack.[7]

In *Escobedo* it was held (p. 986, 12 L.Ed.2d) that where "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution...." In *Dorado* our Supreme Court, speaking through Mr. Justice Tobriner, found prejudicial error in the admission of a confession under circumstances where it affirmatively was shown that the defendant had not been informed of his right to remain silent and also to have the assistance of a lawyer. The court held that the fact that the defendant had not asked for counsel would not of itself constitute a waiver. After quoting with approval the following language from *Carnley* v. *Cochran,* 369 U.S. 506, 513 [82 S.Ct. 884, 8 L.Ed.2d 70], "it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request," our Supreme Court stated at page 351: "We cannot penalize a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness. To require the request would be to favor the defendant whose sophistication or status had fortuitously prompted him to make it." Holding that the facts of the *Dorado* case brought it squarely within the rule of *Escobedo,* the Supreme Court then enunciated the following four point rule (pp. 353-354): "We conclude, then, that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus

---

[7]The rule announced by the Supreme Court in *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], and in *In re Lessard,* 62 Cal.2d 497 [42 Cal.Rptr. 583, 399 P.2d 39], concerning the retroactive effect properly to be given to the holdings in *Dorado* applies exclusively to collateral and not to direct attack on a judgment of conviction.

on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, *and no evidence establishes that he had waived these rights.*'' (Italics supplied.)

In the case at bench the trial was had prior to the time of either the *Escobedo* or *Dorado* decisions. Two statements purporting to be confessions of the defendant were offered and received into evidence. Both appear to be oral summaries of conversations had with the defendant on two different occasions. No contest was made by the defendant to the introduction of the statements on any ground other than that the corpus delicti had not been established. No *voir dire* examination was had, although opportunity for the same was offered to defendant's counsel at the trial and declined. Circumstances surrounding the giving of the statements were therefore not explored, probably because no claim was urged on behalf of the defendant that the confessions were not true, or that they had been obtained by coercion.

The crux of this portion of defendant's appeal consists of the applicability of the four point rule of the *Dorado* case to the facts presented here.

The first of the two incriminating statements in question was obtained from the defendant on January 9, 1963, two days subsequent to the setting of the last fire with which he was charged. The circumstances surrounding the giving of the confession were related by Mr. Bill Deasy, a criminal investigator employed by the Sacramento district attorney's office. Mr. Deasy testified as follows: ''Q. [D]id you have occasion to see the defendant, Charles Allen Andrews? A. I did, in Sacramento County Jail. Q. Where in the jail, sir? A. In one of the interrogation rooms. Q. All right. And were you in the presence of anyone else at that time? A. Mr. John Riggs, a State Parole Agent. Q. All right. And now, did you have occasion to have a conversation with Mr. Andrews at that time? A. I did. Q. And did either you or Mr. Riggs make him any promises? A. No promises were made to Mr. Andrews. Q. Did either one of you threaten him in any way? A. No threats were made. Q. And do you recall what the subject matter of the conversation was? A. *At the time I talked to Mr. Andrews, he was in custody for four fires supposedly started in North Sacramento, California. Our*

*conversation was about those four fires.* Q. All right. And did he tell you anything with regard to the fires? A. Charles Andrews? Q. Well, is your answer yes? A. Yes. Q. And you have already stated you made no promises, you made him no threats? Was his statement to you regarding those fires free and voluntary? A. Yes, sir.'' (Italics supplied.)

Following this foundational introduction, there being no *voir dire* examination, the witness then proceeded to relate the confession of the defendant that he had set all four of the fires in question. From the above record there can be no question as to the applicability of the first two points of the *Dorado* rule. It clearly appears that the defendant was in custody for the North Sacramento fires, and it appears equally clear that the investigation of the four fires, the first of which had occurred on December 25, 1962, was no longer a matter of general inquiry into an unsolved crime but had focused upon the defendant then in custody. In *Stewart, supra,* the Supreme Court on this point held that an arrest fulfills the first requirement of the *Dorado* Rule, and since an arrest includes ''custody,'' the second condition of said rule is also satisfied. The court stated on page 577: ''We believe that the arrest encompasses two of the circumstances which produced the accusatory stages in the *Escobedo* and *Dorado* cases: (1) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, and (2) the suspect is in custody.''

The third requirement of the rule concerns the carrying out by the authorities of a process of interrogation that lends itself to eliciting incriminating statements. In our opinion, the conditions imposed by this portion of the rule are squarely met, as shown by the record before us. The defendant, a prisoner in custody for setting the North Sacramento fires, was being interviewed in the interrogation room of the Sacramento County Jail by two representatives of the law. There was no court reporter, stenographer, or any person present. The interview between the two officers and the prisoner was entirely verbal and not recorded on any type of tape. Officer Deasy took written notes of what was said. According to his testimony a conversation was had between the defendant and the officers, the subject matter being ''about those four fires.''

Officer Deasy did not purport to relate this conversation *in haec verba.* His testimony obviously consisted of a summarization of defendant's incriminating answers, with little reference to what was said by the officers themselves. From the

record, however, we cannot conclude reasonably that the interview in the interrogation room was solely a monologue in which the defendant did the talking and the officers the listening. Officer Deasy testified that it was a "conversation," a word which is ordinarily considered and in fact defined as an "oral interchange" of ideas and observations. (Webster's New Internat. Dict. (2d ed. 1959).)

In light of all the circumstances, the conversation was essentially inquisitorial. As we have noted, *supra,* the law of arson requires a showing not merely that fires had been set but that the perpetrator acted maliciously. The vital element of the act, the sensitive portion thereof that distinguishes it and sets it apart as a crime, is the defendant's intent. And on this crucial point the following was elicited from the defendant in the interrogation room: "Q. And now, what was stated when he told you the reason for doing this? A. That was at the end of the interview, to the best of my recollection, yes. Q. Well, *when you were asking about his reason,* were you discussing all four of the fires? A. Yes, sir. Q. So that it was a matter of relieving animosity, the same as a person might kick a dog or punch somebody, that was his explanation? A. That's correct." (Italics supplied.)

So far as the record shows, the confession elicited by the officers on January 9th was the defendant's first admission that he had set the fires in question. In this connection we are not permitted to indulge in speculation on matters about which the record sheds no enlightenment. We are not informed as to the circumstances of the investigation which led to and attended defendant's arrest, nor what, if anything, occurred during his custody in the Sacramento County Jail prior to the interview with the officers. However, if the defendant had made incriminating statements spontaneously prior to the confession in question, there certainly appears no clue thereof in the record. In any event, our review is restricted to the record before us, and the inferences reasonably to be drawn therefrom.

We conclude that the accusatory stage described in *Escobedo* and *Dorado, supra,* matured in the instant case when the defendant, without counsel, was interviewed by the two officers in the interrogation room of the Sacramento County Jail concerning the setting of the fires for which he then was in custody, and which interview not only lent itself to eliciting incriminating statements from the defendant but actually resulted in a full confession by him. No other theory of the

purpose of this conversation in the interrogation room can be gleaned from the record. We are convinced that every circumstance of fact and inference reasonably deducible therefrom proclaim its purpose, namely, the elicitation of incriminating statements from a suspect in custody.

We do not interpret the holdings in *Dorado* and *Stewart* to necessitate any preliminary showing that the interrogation of a suspect, without counsel, be sustained for any particular time in order to reach "the accusatory" stage spoken of. ▇ The requirement is simply that before an interrogation, the purpose of which is to elicit a confession, is *undertaken* the authorities must inform the suspect then in custody for a particular offense that he is entitled to have the assistance of counsel and to remain silent. The case of *United States* v. *Konigsberg* (3d Cir. 1964) 336 F.2d 844, discussed in *Stewart, supra,* presents no contrary implications. It posed a situation where a number of suspects were apprehended in a garage containing stolen goods. All of them were arrested by agents of the Federal Bureau of Investigation and taken to the bureau's office for questioning. The court found from the evidence before it that the purpose of interrogation, even though it took place after the arrest, was not to elicit a confession but to give Konigsberg a chance to explain his presence in the garage, if he could: to hear Konigsberg's side of the story. There is no evidence, uncontradicted or otherwise, in the record of the case we are reviewing which parallels Konigsberg.

▇ The fact that an incriminating statement was given by the defendant freely and voluntarily certainly does not show fulfillment of *Escobedo* and *Dorado* requirements.[8] The issue now being considered is whether or not the "newly formulated right to the assistance of counsel during police interrogation" (*In re Lessard,* 62 Cal.2d 497, 512 [42 Cal. Rptr. 583, 399 P.2d 39]) was protected properly. In *People* v. *Stewart, supra,* at page 581, it is stated: ". . . Until *Escobedo* and *Dorado,* however, the law of this state did not give an accused a right to counsel during prearraignment interrogations and therefore did not require that an accused be

---

[8]In Witkin, California Evidence (1958) section 242, page 275, under "Confession of Defendant," the following appears: "*Theories and Grounds of Exclusion.* The earlier cases excluded some confessions because of the likelihood that they might be false. The later cases are largely concerned with the protection of personal rights and the curtailment of illegal police practices, regardless of the possible or probable truth of the confession."

advised of his rights to counsel and to remain silent if he had not otherwise waived those rights.''

The first three conditions of the *Escobedo* and *Dorado* rule being applicable the defendant's confession was inadmissible in the absence of a showing that he had been advised of his right to counsel and to remain silent.

The state urges that since the appellant failed to object to the admission of the confessions on constitutional grounds, he waives any right that he might have to present the point on appeal. In his brief the Attorney General says: ''Unfortunately this record is silent in regard to whether or not the appellant was advised of his right to counsel. It certainly fails to reflect that he requested counsel.''

The same point was presented in *Stewart, supra.* In disposing of it, the court stated (p. 581): ''. . . We therefore cannot presume in the face of a silent record that the police informed defendant of his right to remain silent and of his right to counsel. [Citation.]

''. . . It follows that in order to establish a waiver of the right to the assistance of counsel the record must indicate that the defendant was advised of his right to counsel and to remain silent or that he knew of these rights and intelligently and knowingly waived them.''

The record in our case parallels that of *Stewart,* i.e., it does not show that the defendant had been advised by the authorities of his constitutional rights, nor, by the same token, does it show that he was not so advised. On these points it is mute. However, *Stewart* holds that a mere negative record on the constitutional questions involved is not sufficient to insulate the confession from attack on appeal.

Thus far we have directed our comments to the first confession obtained from the defendant for the reason that the circumstances surrounding it would most likely be determinative as to the character of any subsequent statement. The record discloses that the second incriminating statement, upon which the judgment of conviction likewise was based, was obtained from the defendant on January 14, 1962, five days subsequent to the first confession. This second statement was made in the district attorney's office in the presence of representatives of the prosecutor's office. Although a tape recording was taken of the conversation, it was not offered in evidence. Instead Mr. Ben Bruno, a detective in the North Sacramento Police Department, verbally related the incriminating admissions of the defendant in connection with the North Sacra-

mento fires. There was no showing on the record that the defendant had been advised of his right to counsel or to remain silent. Nor was there any evidence of waiver. Therefore, what was said above in relation to the first confession of the defendant applies with greater pertinency to the second incriminating statement; for it scarcely can be contended that after a confession has been obtained authorities who arrange for a repetition of the inculpatory statement of a defendant in front of other witnesses, or who take a tape recording thereof, are not acting in an accusatory and adversary manner.

We hold, under the *Dorado* rule, that the admission in evidence of the defendant's incriminating statements, under the circumstances shown here, constituted prejudicial error and requires reversal. (*People* v. *Stewart, supra; People* v. *Curry,* 232 Cal.App.2d 146 [42 Cal.Rptr. 513]; *People* v. *Moore,* 232 Cal.App.2d 317 [42 Cal.Rptr. 662].)

The judgment appealed from is reversed and the cause is remanded.

Friedman, J., concurred.

PIERCE, P. J.—I dissent. The majority opinion constitutes an *additional* extension of the application of the rule of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], neither required by that decision nor by *People* v. *Stewart* (Mar. 25, 1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]), nor by any principle of constitutional law. And, as I see it, it is directly contrary to well-settled rules of criminal appeals.

*People* v. *Stewart, supra* (p. 576) holds that where the record affirmatively shows (1) the investigation has begun to focus on the defendant, and (2) he is in custody, and (3) "the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements," THEN (4) if the authorities have not effectively informed defendant of his right to counsel or of his right to remain silent, the prosecution must affirmatively establish that defendant had waived these rights.

The majority opinion here adds another obligation of affirmative proof to burden the prosecution. It holds that in any case in which an incriminating statement has been given it must be reversed where (1) the investigation has focused on defendant, and (2) he is in custody, unless the prosecution also shows (3) that the statement was NOT the process of

"interrogations that lent itself to eliciting incriminating statements."

The majority has evolved a new theory of res ipsa loquitur. Effectually, it says: a confession by a suspected defendant in custody frequently happens after the police have conducted a process of interrogations lending itself to eliciting incriminating statements. Therefore, if a confession is given, the law will *infer* it was obtained through such an interrogation. The syllogism applied is this: (1) a defendant was a prime suspect; (2) he was in custody; (3) he confessed; (4) confessions commonly happen after interrogations seeking to elicit them: therefore, (5) this confession was so obtained. This is false logic. I think it is also bad law.

In this record there is not a line of testimony that the statements were made during, or as a result of, an interrogation lending itself to eliciting incriminating statements. The majority opinion says that we must infer this from the fact that the first statement about which there is any testimony was made in an interrogation room and that defendant was asked why he had set the fires and gave his reason therefor, and because the second was tape recorded. Why must we assume that; why are we *permitted* to assume that?

If any inference is to be drawn, I would draw the inference that defendant was being questioned because he had already gone to the police and had told them he had set at least some of the fires. I make this statement advisedly. The case was first tried solely on the evidence at the preliminary hearing, and the trial court dismissed the information upon the ground that the corpus delicti had not been proved. We reversed this ruling on appeal. (*People* v. *Andrews*, 222 Cal.App.2d 242 [34 Cal.Rptr. 118].) As the opinion in that case shows there was proof that the fires were of incendiary origin and such proof established the corpus delicti. But no proof whatever connected the defendant Andrews with the setting of the fires, except his confessions. Nor is there any such evidence in this record. Because of the prosecution's difficulty in establishing the corpus delicti it is inconceivable that any facts connecting defendant with the setting of the fires would have been omitted, had there been such evidence available. How then did the police happen to arrest defendant unless at some stage of the investigation he had voluntarily gone to the police and accused himself? A compulsion to tell, it seems, is not an uncommon characteristic of the arsonist.

If such was the origin of interrogation, I do not think the

narrative account which appears in this record could possibly be deemed the product of an interrogation lending itself to eliciting incriminating statements as that phrase was intended in *Dorado* and *Stewart.* Naturally, if the police have been told by a person that he has committed a crime, they will seek the details and the reasons. They will not refuse to listen until the confessor obtains an attorney or waives his right to one. Nor are they required to. Such interrogation seems clearly outside the scope of *Dorado.*

The majority opinion says we may not ''indulge in speculation'' on the possibility that the incriminating statements which appear in this record had a voluntary origin. But the majority themselves speculate that they did not—although they call their process of reasoning drawing ''an inference.''

As a reviewing court we do not have the right to draw inferences to reverse a judgment. The prosecution did not have the burden to prove that defendant's statements were NOT the result of an interrogation designed to *elicit* a confession. On the contrary, the burden is on appellant to prove that it was. ''A judgment . . . of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'' (3 Witkin, Cal. Procedure (1954) Appeal, § 79, p. 2238.) ''. . . The presumption being in favor of the judgment, the appellate court must consider the evidence in the light *most favorable to the prevailing party,* giving him the benefit of *every reasonable inference,* and *resolving conflicts* in support of the judgment.'' (3 Witkin, Cal. Procedure, Appeal, § 84, p. 2245.) This rule obtains in criminal as well as civil appeals. (Witkin, Cal. Criminal Procedure, Appeal, § 683, p. 666.) This, of course, is elementary.

*People* v. *Stewart, supra,* does not assert a different rule. As stated above it sets up four conditions, all of which must concur before *Dorado* applies. The only condition which the prosecution is required to prove affirmatively is the waiver by a defendant of his right to remain silent and to have an attorney. The reason stated in the opinion for that is that he who relies upon a waiver always has the burden of proving it. It does not assert that the prosecution must show affirmatively either (1) that the investigation has not begun to focus upon defendant, or (2) that he was not in custody, or (3) that the confession was not obtained as the result of an interrogation designed to elicit incriminating statements.

As regards the third contention, the opinion in *Stewart* says (on p. 578): ". . . Although in most cases the process of interrogations following an arrest will . . . lend itself [to eliciting incriminating statements], it does not necessarily do so."

The court then states (on p. 579): "The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. [W]e must . . . analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances."

None of these factors (except place) are before us in this case. The record is silent as to all other factors. The majority opinion has "inferred" that they exist. They have thus required the prosecution to prove the negative of a test which concludes such a will-o-the-wisp as "all other relevant circumstances."

Supplementing what has been said by Justice Tobriner in *People* v. *Stewart, supra,* about the "silent record" is the discussion of Justice Stone in his dissenting opinion in *People* v. *Campbell,* 233 Cal.App.2d 38, 50-51 [43 Cal.Rptr. 237]. He points out *Dorado* has simply added to the "foundational proof" which California courts have long required preliminary to the introduction of a confession (*viz*: that the confession was freely and voluntarily made, without coercion, threats, or undue pressure, and without promises of reward, immunity from punishment, or leniency.) But the *foundational proof* which *Dorado* requires does *not* include affirmative proof that when a confession was given (1) suspicion had *not* focused upon defendant, or (2) that he was *not* in custody—at least no court has yet said that it does. And in my opinion it is no more sensible to require foundational proof that a confession offered was (3) *not* made during or after a process of interrogation designed to produce a confession than it would be to require foundational proof negating the other conditions.

Under the rule that error will not be presumed, I would hold that where the record shows that a confession is free and voluntary, without coercion, threats, undue pressure, promises of reward or immunity, etc., and the record is silent on the matter of any one of the three conditions precedent,

*all of which must concur* before the *Dorado* rule is applicable, a reviewing court must affirm.

Moreover, if this is not to be the rule to be applied hereafter : if from now on the prosecution must assume the burden of disproving ALL factors which could make an extrajudicial incriminating statement inadmissible, I would not apply the rule retroactively.

*In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], Justice Tobriner, author of the majority opinion, observed (on p. 375) that "the new rule [of *Escobedo*] need not reach back to eradicate an environment entombed in the past;" and he said (on p. 379) "a newly defined constitutional right which involves the correction of future practices rather than erroneous convictions of the past should not be subject to rigid retroactivity." Those statements were made with reference to a collateral attack upon a final judgment. To me they have just as much relevancy to a silent record—silent because the rule was nonexistent when the case was tried.

These crimes were committed nearly two and a half years ago. It is only the unfortuitous (or fortuitous depending upon the point of view) circumstance of a former appeal that the judgment was not final long ago. There is not the slightest doubt as to the defendant's guilt. His confessions were explicit : they were uncoerced. There is no proof they were solicited. It is just as unreasonable to send this stale case back, placing the burden on the prosecution to prove how and why the confessions were obtained, as it would have been in *Lopez*.

I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied June 23, 1965.